FRANK HOELZEL v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, a Corporation, FRED M. CARDEN and ARTHUR J. WILLIAMS, Appellants.—85 S. W. (2d) 126.

Division One, July 9, 1935.*

*NOTE: Opinion filed at September Term, 1934, February 15, 1935; motion for rehearing filed; motion overruled at May Term, July 9, 1935.

*Luther Burns, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

64

*James P. Aylward, Pross T. Cross, Gerald Cross* and *Terence M. O'Brien* for respondent.

FRANK, J.—Action to recover damages for alleged personal injuries. Respondent, plaintiff below, recovered judgment for $20,000 and defendants appealed.

Plaintiff's injuries were caused by a collision between an automobile truck in which he was riding and a passenger train owned and operated by defendant railroad. Defendant, Carden, was the engineer and defendant, Williams, was the fireman on said train.

The collision occurred in the city of Liberty, Missouri, on January 24, 1930, at a public crossing formed by the crossing of Leonard Street and the railroad track in said city. Leonard Street runs north and south and the railroad track east and west.

The case was submitted to the jury under both primary and humanitarian negligence. The primary negligence submitted was the operation of the train at a rate of speed in excess of that fixed by an ordinance of the city, and failure to give the statutory signals. The humanitarian negligence submitted was the negligent failure to stop the train or slacken the speed thereof or give timely warning of its approach after plaintiff was or should have been discovered in a position of peril.

The evidence favorable to plaintiff tended to show the following facts:

Plaintiff was riding northward on Leonard Street in an automobile truck driven by one L. F. Minter. He did not own the truck and had no control over it or the driver thereof. It is not contended that plaintiff and the driver of the truck were engaged in a joint enterprise or that the negligence of the driver, if any, was imputable to plaintiff. When the truck reached a point thirty or forty feet south of the crossing the driver of the truck brought it almost to a stop and both he and plaintiff looked and listened for the approach of a train, and looked and listened for bells, whistles or warning signals. The bells at the crossing were not ringing, nor were the crossing lights flashing, and no locomotive bell was rung or whistle sounded at any time before the collision. Plaintiff had passed over this crossing on other occasions, and had observed the crossing bell and crossing signals in operation when a train was approaching. After slowing down the truck and looking and listening as above stated, and not seeing or hearing the train or any sign or signal of its approach, the driver of the truck shifted into second gear and applied the gas for the purpose of going over the crossing. When the truck got within fifteen or twenty feet of the track, plaintiff for the first time saw the train and warned the driver of the truck. At that time the train was one hundred fifty feet east of the crossing and was moving westward at a speed of thirty or thirty-five miles per hour. Plaintiff testified that he could not have seen the train sooner than he did see it because of an embankment covered with drifted snow which obstructed the view and because of the curve in the track. The driver of the truck saw the train at the same time plaintiff saw it, and immediately applied his brakes in an effort to stop the truck. On account of the slick and slippery condition of the street due to ice and snow thereon, the truck slid toward the track after the brakes were applied. Believing a collision was inevitable if the truck continued forward, the driver immediately turned it to the left and drove along the south side of the track for a distance of

68

thirty or forty feet where the train overtook and struck the truck. There was no slackening of the speed of the train until after the collision. Other necessary facts will be stated in connection with questions discussed.

Plaintiff's Instruction No. 1 predicated a verdict for plaintiff upon a finding by the jury, among other facts, that the collision was caused by the operation of the train at a rate of speed in excess of the ordinance rate of ten miles per hour. Appellants contend there was no substantial evidence tending to show that the operation of the train at a rate of speed in excess of ten miles per hour was the proximate cause of the collision and, for that reason the instruction submitting that issue to the jury was prejudicially erroneous.

There was in force in the city of Liberty an ordinance limiting the speed of trains to ten miles per hour. The train was moving at a speed of thirty or thirty-five miles per hour. The evidence favorable to plaintiff was to the effect that the truck was brought to almost a stop thirty or forty feet from the crossing, where both plaintiff and the driver looked and listened for an approaching train. Not hearing or seeing a train, or any sign or signal of one's approach, the driver of the truck applied the gas and proceeded toward the track at a speed of four or five miles per hour intending to cross the track. After traveling twenty-five of the forty feet he was then within fifteen feet of the track where he discovered the near and dangerous approach of the train which caused him to immediately apply his brakes and turn the truck to the left and along the south side of the track in an effort to avoid the collision. While the truck traveled the twenty-five feet at the rate of five miles per hour, the train would travel seven times twenty-five or one hundred seventy-five feet at the rate of thirty-five miles per hour. The one hundred seventy-five feet added to the one hundred fifty feet, the distance the train was from the crossing after the truck had traveled the twenty-five feet, shows the train to have been three hundred twenty-five feet from the crossing when the truck was forty feet from it. If, as plaintiff's evidence tended to show, the truck was traveling at four or five miles per hour, and if the train had been running at the ordinance rate of ten miles per hour, the truck would have traveled 162½ feet while the train traveled the 325 feet. If the train had been traveling at the ordinance rate of ten miles per hour, and if the truck had proceeded northward instead of turning to the left, it would have crossed the track in safety and reached a point approximately one hundred feet north of the crossing by the time the train arrived at the crossing. Otherwise stated, the evidence favorable to plaintiff tended to show that if the train had been obeying the ordinance the truck could and would have crossed the track in safety, before the train reached the crossing. In this connection appellants

contend that the evidence of the driver of the truck does not warrant the inference that the speed of the train induced him to swerve the truck to the left, but on the contrary tends to show that he deliberately and intentionally swerved the truck, and at no time had any intention of trying to cross the track. The record does not sustain this contention. The driver positively testified that after slowing down the truck and looking and listening for a train, he shifted into second gear, applied the gas and started on across the track. He further testified that when he first discovered the train he figured that he could not get across, 'so I slapped on the brakes right quick and turned into the left.''

Evidence tending to show that after slowing the speed of the truck and looking and listening for a train, he applied the gas and started across the track, but was caused to turn to the left because of the near and dangerous approach of the train, together with evidence that he would have had ample time to cross the track in safety if the train had been running at the ordinance rate of ten miles per hour, warranted an inference that he would have crossed the track instead of turning to the left if the train had been operated at the ordinance rate. We therefore hold that the alleged excessive speed of the train as a proximate cause of plaintiff's injuries was properly submitted as a question of fact to be determined by the jury.

█ Appellants concede that the question of plaintiff's contributory negligence was for the jury, but contend that plaintiff's Instruction No. 1 erroneously limited the issue of contributory negligence to the exercise of ordinary care by plaintiff at and just prior to the time of the collision.

The instruction requires the jury to find that plaintiff was exercising ordinary care at and just prior to the time the engine and train struck and injured him. The words "just prior" clearly indicate that the instruction does not limit the exercise of due care to the moment of the impact. Necessarily the words "just prior" mean some period of time before the collision. While the instruction is not happily worded, it should be construed in the light of the effect it was calculated to have on the minds of the jurors. We believe any juror would understand that the instruction did not restrict the exercise of due care to the moment of the collision, but referred to and covered the entire occurrence. Other courts have so construed similar instructions. [The Chicago & Alton Railroad Co. v. Corson, Administrator, 198 Ill. 98; Bux v. Illinois Central Railroad Co., 229 Ill. App. 50.] We rule this contention against appellants.

█ It is next contended that plaintiff's Instruction 2 authorized a verdict for plaintiff for failure to sound the engine bell although the jury might find that the whistle was sounded, or for failure to

sound the whistle although the jury might find that the bell was sounded.

A railroad owes no duty to sound both bell and whistle. Its duty under the statute is performed if it sounds either the bell or the whistle. If it sounds either, it cannot be held liable for failure to sound both. [Sec. 4756, R. S. 1929.] The fault in appellants' contention is that the instruction is not subject to the criticism leveled against it. The wording of the instruction without argument or citation of authority, clearly demonstrates that fact. That part of the instruction reads as follows:

". . . That he neglected to cause said whistle to be sounded as above stated and that same was not sounded, and that he neglected to cause said bell to be rung as above stated and that same was not rung, and if you further find and believe that such neglect, if any, was a proximate cause of the truck in which plaintiff was riding being struck on said crossing and of plaintiff being struck and injured. . . ."

It is apparent from a reading of the instruction that it requires a finding that neither the bell nor the whistle was sounded.

■ Further contention is made that plaintiff's Instruction 2 was erroneous as to engineer, Carden, for the reason that an engineer is not liable in damages for failure to give the statutory engine signals.

The instruction predicated a verdict for plaintiff and against the railroad and its engineer, Carden, upon a finding by the jury that the statutory crossing signals were not given. Section 4756, Revised Statutes 1929, relative to the giving of crossing signals provides as follows:

"A bell shall be placed on each locomotive engine, and be rung at a distance of at least eighty rods from the place where the railroad shall cross any traveled public road or street, and be kept ringing until it shall have crossed such road or street, or a steam whistle shall be attached to such engine and be sounded at least eighty rods from the place where the railroad shall cross any such road or street, except in cities, and be sounded at intervals until it shall have crossed such road or street. . . ."

Under the common law it is the duty of a railroad and its engineer in charge of an engine approaching a public crossing to exercise ordinary care to prevent injury to persons or property on or dangerously near such crossing. The statute providing for the giving of crossing signals by bell or whistle did not repeal the common law, but is merely cumulative of the common-law duty to exercise ordinary care. The statute not only enjoins that crossing signals shall be given as therein provided, but provides in express terms, who shall be liable for damages that result from a failure to give such signals. The pertinent part of the statute reads as follows:

". . . *And said corporation* shall . . . be liable for all damages which any person may hereafter sustain at such crossing when such bell shall not be rung or such whistle sounded as required by this section." (Italics ours.)

The instruction in question predicates a recovery for plaintiff, not on the common-law duty of the railroad and its engineer to exercise ordinary care to prevent injury to plaintiff, but on the failure to give the statutory signals. Where a plaintiff seeks to recover damages because of a failure to give the statutory crossing signals, he must recover, if at all, from the party whom the statute makes liable for failure to give such signals. Otherwise stated, where damages are sought because of the violation of a statute, no recovery can be had except in accordance with the terms of the statute. By the terms of the statute in question, the only party made liable in damages which result from failure to give the statutory signals is the railroad. It results that the instruction authorizing a verdict against the railroad and its engineer upon a finding that the statutory signals were not given, was erroneous as to the engineer, but was not error as to the railroad because by the terms of the statute the railroad is made liable for all damages which result from a failure to give the statutory signals. [Lynch v. Missouri-Kansas-Texas Railroad Co., 333 Mo. 89, 61 S. W. (2d) 918, 924; Goodhue v. Dix, 68 Mass. 181; 39 C. J., p. 1302.]

█ It is contended that plaintiff's Instruction No. 3 submitted an issue of primary negligence in connection with negligence under the humanitarian doctrine. The part of the instruction against which the complaint is made reads as follows:

" 'The court instructs the jury that if you find and believe from the evidence that the place where the train mentioned in evidence struck and collided with the truck mentioned in evidence was within the corporate limits of the City of Liberty and at or near a point where a traveled public street and highway (known as Leonard Street) crossed and ran over said railroad track—then, under the law, it became and was the duty of defendants in running and operating said train up to and over said crossing, to exercise ordinary and reasonable care to look out for and to discover the presence and near approach of persons and vehicles on or near and about to go upon said track, and to use ordinary care to prevent the injury of any person thereon or thereat.

" 'And a failure to perform this duty, if you believe from the evidence there was such a failure, is negligence as a matter of law.' "

It was defendants' duty under the humanitarian doctrine to exercise ordinary and reasonable care to look out for and to discover the presence and near approach of persons and vehicles on or near and about to go upon the track, and to use ordinary care to prevent the injury of any person thereon or thereat. [Hults v. Miller, 299

S. W. 85, 89.] Such being the duty of defendants in the premises, a violation of that duty would be negligence. Defining the duty of defendants under the humanitarian doctrine, and characterizing a violation of that duty as negligence is not the submission of primary negligence. The concluding part of the instruction against which this complaint is not lodged, hypothesizes all of the facts necessary to a recovery under the humanitarian doctrine. The contention is ruled against appellants.

Further contention is made that the instruction authorized a verdict against all of the defendants when it was undisputed that, Carden, the engineer, could not see the truck because it approached the track from the fireman's side of the engine.

The claim is that in defining the duty which was owed to plaintiff, the first paragraph of the instruction used the word "defendants" which necessarily included the engineer.

While the first paragraph did use the word "defendants" in defining the duty owed to plaintiff, the next paragraph hypothesized only such facts as were necessary to authorize a verdict against the railroad and the fireman, and directed a verdict against the railroad and the fireman only, in event the jury found the facts hypothesized in the instruction. The instruction hypothesized no facts against the engineer and did not direct a verdict against him. Our judgment is that no juror would get the idea from reading the instruction or hearing it read, that it authorized a verdict against the engineer. The first paragraph of the instruction, standing alone, would necessarily refer to the three defendants, but the subsequent parts of the instruction directing the facts to be found to entitle plaintiff to a verdict against the fireman and the railroad, and authorizing a verdict against the fireman and railroad only, rendered the error, if any, in the first paragraph of the instruction harmless. [Drake v. Kansas City Public Service Co., 333 Mo. 520, 63 S. W. (2d) 75, 81-3.]

Further contention is made that Instruction 3 was erroneous in submitting the failure to slacken the speed of the train and failure to warn plaintiff of its approach, because the evidence did not justify the submission of either.

Appellants concede there was substantial evidence tending to show that the collision could have been avoided by stopping the train, and no complaint is made because of the submission of that issue. The train was traveling thirty or thirty-five miles per hour. Two qualified witnesses called by plaintiff, testified to the distance in which this train could have been stopped with safety to the passengers, etc. One testified that it could have been stopped within fifty to seventy-five feet, the other witness said within one hundred to one hundred twenty-five feet. Defendant's fireman testified that no attempt was made to stop the train or slacken its speed until after

the collision; that it was then stopped within approximately 108 feet. We have pointed out in the earlier part of this opinion that when the truck was forty feet from the crossing, the driver thereof brought the truck almost to a stop and looked both ways and listened for a train. At that time the train was 325 feet from the crossing. There was substantial evidence that the fireman saw or by exercising ordinary care could have seen the truck at that time. He is held to have seen what he could have seen by looking. Evidence that the driver of the truck brought it to almost a stop when forty feet from the crossing and there looked and listened for a train, then shifted the truck into second gear and applied the gas for the purpose of going over the crossing, was sufficient to indicate. to the fireman on the engine that the driver of the truck was oblivious of the approach of the train and intended to cross the track. Under such circumstances, it was the duty of the fireman to inform the engineer of the situation, in order that steps might be taken to avoid the collision. If, as the evidence tends to show, the train was 325 feet from the crossing at that time, and if it could have been stopped within a distance of 125 feet, it necessarily follows that its speed could have been reduced to any given rate within that distance. Suppose its rate of speed had been reduced to five miles per hour within a distance of 125 feet, the train would then have been 200 feet from the crossing traveling at the rate of five miles per hour, and the truck would have been approximately fifteen or twenty feet from the crossing, traveling at the same rate of speed—five miles per hour. Such a situation would have enabled the truck to cross the track in safety. Mathematics demonstrates the same thing would have been true had the speed of the train been reduced to ten miles per hour. As heretofore pointed out, the evidence warranted the inference that when the engine was 325 feet from the track, the fireman could and should have discovered that the driver of the truck was oblivious of the approach of the train and intended to cross the track. At that time the truck was forty feet from the track. If an adequate warning had been given at that time, the driver of the truck would have had a distance of thirty or forty feet in which to stop the truck, and there was evidence that it could have been stopped in much less than that distance. Whether or not the collision could have been averted by slackening the speed of the train or by giving timely and adequate warning of its approach was properly submitted to the jury.

It is contended that the verdict is excessive.

Concerning his injuries plaintiff testified, in substance, as follows: ██ Prior to the collision he was in good health and able to do hard manual labor; that the force of the collision rendered him unconscious; that since the collision he has had constant headaches and his back gives him trouble whenever he stands or walks around;

that he received a blow on the right side of the head above the ear; that his eye was injured and still gives him trouble; that at the time of the collision he had hemorrhages from the nose, ears and mouth; that he is bothered in walking either up or downgrade; that since the collision he has been considerably nervous; that he has great trouble in sleeping and has to take medicine to get sleep; that he received an injury to his knee which required him to wear a rubber elastic over it for more than a year; that if he twists his knee or stands very long, it gives way, with a sharp pain or tearing sensation; that he received two hurts to his back, one above the thigh, the other below the shoulder; that one of the blows was just above his kidneys, and blood passed from his kidneys and bladder for six weeks after the injury; that there was a large lump between his shoulder blades; that he was confined to his home and bed for two and one-half months after the collision. He further testified that he was engaged in the contracting business, and prior to the collision was able to and did superintend the work, but since the collision he has had to hire a superintendent at a cost of forty dollars per week.

Dr. Ferguson, plaintiff's attending physician, testified concerning his injuries. Respondent's brief correctly narrates his evidence as follows:

"'He was in great pain, unable to move because of terrific pain in his back and in the side of his head, the right side of his head, and his knee, and he had a slight hemorrhage of the right ear. The side of the face was swollen. Back from about the third vertebrac to the end of the spine was discolored; ecchymosis, we call that; and extremely tender, and he was unable to move because of his pain and tenderness. His right knee was swollen and immobile, unable to move that because of pain, and he was in what we call extreme shock from traumatism. I regarded him as a very sick man.'"

"'I kept him in bed approximately two weeks; moved him to the St. Joseph Hospital, where we had X-rays of his back, and moved him back home, and then he was in bed, off and on, for two or three months. . . . There were some minor bruises . . . the side of his face and right ear were swollen and the right ear was discolored; the lower portion of the right ear was discolored; his hearing was impaired. He was unable to hear; the right eye—there was what we call, in medicine, a ptosis, a dropping down of the right eyelid, and he complained of a pain in this eye, and it watered. The tears,—the lacrimal duct was obstructed. He passed large quantities of blood from his kidneys and bladder.'"

"'He had evidence of hemorrhages from the ear and from the mouth. I prescribed "absolute rest in bed; of course; sedatives for his nervous system." For his knee, I prescribed "immobilization, rest and, later on, the appliances customary were put on the knee,

such as the elastic stocking, etc.'' He has an elastic stocking which he wears. I imagine he is probably wearing it now. He still complains of his knee.

'' 'I gave him the ordinary sleeping potions, such as bromides; I gave him those things.' ''

'' 'The man was in great pain, due to the injury of his back, his head and his knee, and he had extreme tenderness of his back and extreme tenderness of his knee when you would move it, and his head when you would touch it; and he was unable to move. We had to roll him about in bed and had to carry him about. He was unable to walk because of this tenderness and immobility. . . . He could not walk when he first got up.' ''

Dr. Ferguson further testified that plaintiff had a railway spine. He then described a railway spine as follows:

'' 'A railway spine is a condition arising from an accident, any accident, when there is great fear, and traumatism is involved; the natural shock of the accident, and this condition may or may not be found in the presence of actual physical findings, like a fracture or dislocation. It may be due solely to the shock alone, without physical findings. It is more serious than where you find a fracture. It is, I would say, a very serious injury . . . extremely so.' ''

He further testified that the drooping eyelid had not improved since the collision; that the cartilage and ligaments of the knee were permanently injured; that he had a concussion of the brain at the time of the collision; that his injuries were permanent and disabling.

He further testified that the X-ray pictures of plaintiff's head showed a fracture of the skull.

Dr. L. A. Marty, an X-ray expert, testified that the X-ray plates introduced in evidence indicated a fracture of plaintiff's skull some ten or twelve inches long. He further testified that bleeding from the eyes, ears, nose and mouth, and a fracture of the skull followed by unconsciousness indicate a concussion of the brain. He also testified that the X-ray plates showed a flattening of the front, and a narrowing of the anterior borders of the third and fourth lumbar vertebrae. Concerning the character and extent of plaintiff's injuries, Dr. Marty, said they were permanent and probably progressive in character. He further said that plaintiff was not able to perform any labor at the time of the trial, and assuming that such condition had existed since the date of his injury, he would not be able to do so in the future.

The character of plaintiff's injuries were such that lay jurors could not determine their extent by observation, such as they would be able to do, in a large measure, in case of the loss of a leg or the loss of an eye, and other like cases. Judges are somewhat in the position of lay jurors in this regard. In such cases courts should

not be quick to disturb the verdict of a jury where it is supported by substantial evidence, the weight and credibility of which is for the jury, unless the amount of the verdict is manifestly out of proportion to the injuries proven. In view of these well-established principles, and in view of the evidence describing the character and extent of plaintiff's injuries, we do not feel warranted in saying as a matter of law that the verdict of $20,000 is excessive.

We find no error in the record as to defendant, railroad, and defendant, Williams, its fireman. However, we do find that error was committed against defendant, Carden, the engineer, by the giving of plaintiff's Instruction No. 2. That instruction directed a verdict against both the railroad and its engineer in event the jury found the statutory signals were not given. A railroad is, but its engineer is not liable for damages which result from failure to give the statutory signals, for reasons heretofore stated in this opinion.

Appellants contend that because of the error committed against the engineer, the judgment should be reversed and the cause remanded for a new trial against all defendants. We do not agree with this contention. While the decisions in this State are not in accord on this subject, we think the correct rule is announced in Stotler v. Railroad, 200 Mo. 107, 149, 98 S. W. 509, by a unanimous opinion of the Court en Banc. It is there said:

"... We consider it established on reason and authority that we may reverse as to one tortfeasor and affirm the judgment as to others. [R. S. 1899, sec. 866.] The earlier doctrine was to look on a judgment as an entirety and to be reversed as to all, if reversed as to one. But the later and better rule is to go deeper than the mere shell of the judgment and look into the nature of the case itself, and where the interests of parties to an appeal may be rightfully severed, where the errors do not affect the parties jointly and where the rights of one party are not dependent upon those of another, then, it is not necessary to reverse the entire judgment. [Elliott on Appellate Procedure, secs. 574, 575.]"

The ruling in the Stotler case has been approved by this court in later cases. [Adair v. Railway Co., 282 Mo. 133, 220 S. W. 920; Gerber v. Kansas City, 311 Mo. 49, 60, 277 S. W. 562; Clark v. Railroad, 234 Mo. 396, 435, 137 S. W. 583.]

In the case at bar, the error pointed out did not affect the parties jointly, and was not calculated to affect any one except the engineer against whom it was committed. This court has a right to say whether or not an instruction is calculated to prejudice a jury, and we have not hesitated to exercise that right when the occasion demanded it. The error in this case was the giving of plaintiff's Instruction No. 2 which directed a verdict against the railroad and the engineer upon a finding that the statutory signals were not given. This instruction could not have affected the liability of the railroad,

because the railroad is liable for damages resulting from a failure to give such signals. It could not have affected the liability of the fireman because it did not mention him or direct a verdict against him. An instruction telling the jury that the engineer was liable in damages for failure to give the statutory signals was not calculated to prejudice the minds of the jury as to the character or extent of the plaintiff's injuries or the amount he should recover therefor, because it makes no reference whatsoever to either of these subjects. We must presume the jury followed the instructions, therefore an instruction that is not calculated to mislead is not erroneous. It results that we have a case in which no error was committed against the railroad and its fireman, either as to liability or amount of damages assessed. This being true, the verdict as to both liability and amount of damages should be permitted to stand as against them. As the error committed against the engineer affected his liability only, and not the amount of damages assessed, in event of a retrial it should be on the issue of his liability only.

Two recent decisions of this court, Neal v. Curtis & Co. Mfg. Co., 328 Mo. 389, 41 S. W. (2d) 543, and Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. (2d) 559, reached a contrary conclusion on a similar state of facts. In each of the cited cases the court found there was error committed as to one defendant but not as to the other, and reversed and remanded the cause with directions to the trial court to hold in abeyance the verdict of liability as to the defendant against which no error was committed, and directed a new trial as to the liability of the other defendant against which error was committed. Thus far we agree with the holding in these cases, but they go a step farther and direct a new trial as to both defendants on the question of damages, giving as a reason therefor that it was necessary to do so in order to avoid two judgments in the case, which, in all probability, would be for different amounts.

We agree that there can be but one final judgment in a case which must dispose of all the issues, but we do not agree that it was necessary, in the cited cases, to direct a new trial on the question of damages in order to prevent two judgments in the same case. If, in the cited cases, the verdict of liability was permitted to stand against one defendant because it was free from error, by the same token, if the verdict as to the amount of damages was free from error, it likewise should have been permitted to stand against that defendant. Two judgments in the same case could have been prevented by reversing the judgment and remanding the cause with directions to hold in abeyance the verdict as to both liability and amount of damages as to the defendant against which no error was committed, until the cause was finally disposed of as to the liability only of the other defendant, then enter judgment for the

amount of the verdict held in abeyance against all defendants finally held liable.

A plaintiff should be permitted to hold the amount of a verdict in which there is no error. A defendant should not be given a second trial of an issue where there was no error in the first trial of that issue. The rule we suggest · reaches that result, but the rule announced in the cited cases does not, and for that reason they should not be longer followed on that point.

There is no set rule which should govern this question in every case against two or more joint tort-feasors. It is the duty of the court, in the light of the facts of each particular case, to determine the character of the error and the issues affected thereby, and rule the question accordingly.

For the reasons stated, the judgment herein is reversed and the cause is remanded with directions to the trial court to hold in abeyance the verdict as to both liability and amount of damages against defendant, Chicago, Rock Island and Pacific Railway Company, and defendant, Williams, until the case is disposed of as to the liability of defendant, Carden, then enter judgment for the amount of the verdict held in abeyance against all defendants finally held liable. *Hays, J.,* concurs; *Gantt, J.,* concurs in result; *Coles, J.,* not sitting.

## ON MOTION FOR REHEARING.

PER CURIAM:—The evidence tended to prove that when the engine was 325 feet from the crossing and the truck 40 feet from the track, the fireman could and should have discovered that the driver of the truck was oblivious of the approach of the train and intended to cross the track, and could have thereafter sounded an adequate warning in time to have enabled the driver to avoid the collision by stopping the truck. The trial court submitted negligent failure to warn which was approved by this court.

Appellant contends that in approving the submission of negligent failure to warn, we overlooked the fact that plaintiff and the driver of the truck both testified that when the truck was 40 feet from the track and the engine 325 feet from the crossing, they looked but did not and could not see the train; that they continued to look and did not and could not see the train until the truck was within fifteen feet of the track and the train within 150 feet of the crossing.

Appellant contends that necessarily the fireman could not have seen the truck and its occupants any sooner than the plaintiff and the driver of the truck could have seen the train. [Bollinger v. St. Louis-San Francisco Railway, 334 Mo. 720, 732-3, 67 S. W. (2d) 985.]

We have no fault to find with the holding in the Bollinger case. The holding in that case was that, "The same gloom, mist and fog

which prevented plaintiff and the driver of the Ford car from seeing the coming train also prevented the operators of the train from seeing the approaching Ford car.''

The proof in the case at bar was not such that we can say, as a matter of law, that if the fireman could see the truck when it was forty feet from the truck, necessarily the occupants of the truck could see the train at that time. There was evidence that the distance from the top of the rail to the level of a man's eyes when sitting in the fireman's seat on the engine was eleven feet. It is a matter of common knowledge that the distance from the ground to the level of a man's eyes when sitting in an automobile is considerably less than eleven feet. Plaintiff testified that an embankment covered with drifted snow and a curve in the track prevented him seeing the train until the truck was within fifteen feet of the track. It might well be that the embankment covered with drifted snow obstructed plaintiff's view of the train, but did not, on account of the fireman's elevated position, and on account of the fact that the truck was much closer to the embankment than the train was, obstruct his view of at least the top of the truck as it approached the track. We would not be justified in holding otherwise, as a matter of law. We did not discuss this question in the opinion, hence this memorandum on the point. Other points presented in the motion do not present any reason for rehearing. The motion for rehearing is overruled.