PATRICIA ECKNER, RESPONDENT, v. WESTERN HAIR AND BEAUTY SUPPLY COMPANY, A CORPORATION, APPELLANT.—162 S. W. (2d) 621.

St. Louis Court of Appeals. Opinion filed June 2, 1942.

Motion for Rehearing Overruled June 19, 1942.

*Edward M. Radloff* for respondent.

990

L. J. Reidel and J. A. Gochenour for defendant.

McCULLEN, J.—This is a suit for damages, both actual and punitive, brought by respondent, as plaintiff, against appellant, as a defendant. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff and against said defendant in the sum of $10 actual damages and $800 punitive damages on count one of plaintiff's petition, and $500 actual damages and $500 punitive damages on count two of said petition. Defendant duly appealed.

In her original petition plaintiff named as defendants Western Hair Goods Company and Arthur Silvers. Thereafter, plaintiff filed an amended petition in which Western Hair and Beauty Supply Company, appellant herein, was added and joined as a defendant.

In the first count of plaintiff's said amended petition she alleged that on June 4, 1940, defendants Western Hair Goods Company and Western Hair and Beauty Supply Company, by and through their agent, servant and employee Arthur Silvers, the other defendant herein, acting within the scope of his authority entered plaintiff's place of business in the City of Richmond Heights, Missouri, and, after demanding payment for merchandise purchased by plaintiff from defendants Western Hair Goods Company and Western Hair and Beauty Supply Company, wilfully and wantonly diverted to their own use a Queens Hair Clipper of the value of $10; and that when plaintiff attempted to restrain defendant Silvers from taking her property, he, in the presence of plaintiff's employees and customers, without cause or reason, wilfully and wantonly pushed and shoved her about thereby directly causing her to sustain injuries and damages; that on said 4th day of June, 1940, plaintiff was the owner of said Queens Hair Clipper; that defendants wilfully took possession thereof and converted the same to their own use, whereby plaintiff sustained damage for said wrongful taking and detention. Plaintiff prayed judgment for $10 actual and $2500 punitive damages on the first count.

In the second count of her amended petition plaintiff reiterated the allegations of the first count, and further alleged that, as a direct and proximate result of ''the aforesaid wilful, malicious and wanton assault of the defendant Arthur Silvers, acting individually and as agent, servant and employee of the defendants Western Hair Goods Company and Western Hair & Beauty Supply Company, within the scope of his authority, she sustained injuries to her right arm, serious and permanent nervous shock to her entire nervous system and was greatly humiliated in the .presence of her customers and employees.'' Plaintiff prayed for $2500 actual and $5000 punitive damages on the second count of said petition.

992

Defendants filed an answer containing a general denial as to each of the two counts of plaintiff's petition.

It appears that plaintiff dismissed the case as to defendant Western Hair Goods Company at a trial on February 6, 1941, following which there was a verdict for plaintiff against defendant Western Hair and Beauty Supply Company. Thereafter the trial court sustained said defendant's and plaintiff's motions for a new trial, and there was a second trial at which plaintiff dismissed as to Silvers. Then followed the verdict and judgment from which this appeal was taken as heretofore stated.

Defendant contends that the trial court erred in refusing to grant it a continuance on the day of the trial when plaintiff dismissed her case as to Arthur Silvers, leaving it as the sole defendant in the case. It is argued that the dismissal as to defendant Silvers constituted an amendment of substance and that the court should have granted a continuance in accordance with the statute, Section 1092, Revised Statutes of Missouri, 1939.

The application for the continuance was made orally prior to the commencement of the trial. The only reasons given for requesting the continuance were that the defendant was surprised when plaintiff dismissed as to defendant Silvers; that when it announced ready for trial, it was under the impression that the co-defendant Silvers, who was alleged to have actually committed the tort in question, would be in the case. Defendant argues that it should have been granted a continuance so that it could have made other arrangements for defense if deemed necessary after fully analyzing the situation created by the dismissal of plaintiff's case as to Silvers.

The granting or refusal of an application for continuance is a matter within the sound discretion of the trial court. It is sufficient to say that there is no showing whatsoever in this record to indicate that the court abused its discretion in refusing the continuance, or that defendant was in anywise prejudiced thereby. This point is ruled against defendant. [Hall v. Williams, 330 Mo. 473, 50 S. W. (2d) 138; Peterson v. Metropolitan St. Ry. Co., 211 Mo. 498, 111 S. W. 37; Jacobson v. Graham Ship-by-Truck Co. (Mo. App.), 61 S. W. (2d) 401.]

Defendant contends that the court erred in refusing to give its demurrers to the evidence offered at the close of plaintiff's case and at the close of the whole case. As one of the grounds for this contention, it is argued that plaintiff failed to prove that Silvers, who was alleged to have committed the assault on plaintiff, was an employee or agent of defendant Western Hair and Beauty Supply Company; that the most that could be said is that plaintiff probably made out a *prima facie* case against the Western Hair Goods Company, which company was originally a defendant in the case.

Plaintiff testified that in April, 1940, she purchased the beauty shop business located at 7370 Dale Avenue, Richmond Heights, and that Silvers was introduced to her at that time as a representative of the Western Hair and Beauty Supply Company by Mrs. Lucich, the former owner of the shop; that Silvers had sold quite a bit of supplies to the shop and the fixtures were from the company by whom he was employed; that Silvers solicited plaintiff's business at the time she purchased the shop, and made up a list of what she needed; that she placed an order that was delivered by Silvers the next day; that Silvers said that the former owner of the shop had an open account with the company and that plaintiff could have one also, and that she could have until the 10th of June to pay her bill which amounted to $9.38; that thereafter, one morning she had a phone call, the gentleman on the other end saying, "I am Mr. Abraham Block, President—." At this point in her testimony plaintiff was interrupted by an objection, following which plaintiff testified that she had a conversation with Mr. Abraham Block, President of the Western Hair and Beauty Supply Company; that he called her on the phone and told her he was coming out; that said conversation was about three or four days after she had placed the order with Silvers; that Block came to her shop on an afternoon to speak to her about the fixtures; that Block ordered her to pay the three back installments owed on the fixtures by the previous owner; that he told her she would have to pay up or they would take the fixtures; that she had two or three conversations with Mr. Block, who then invited her over to his office to talk things over; that Mr. Silvers called at the shop regularly once a week, but plaintiff didn't place any more orders with the company nor did Silvers request payment for the goods previously delivered; that she turned over to Mr. Block on a Saturday the fixtures which she had received from the prior owner; that Mr. Silvers later came out and demanded payment of her bill; that on June 4, 1940, about 9:30 in the morning, Mr. Block called on the telephone and said he wanted all the money on the account that day or that he would have to take something from the shop as security; that he was sending Mr. Silvers out to collect the money or to take something out of the shop as security; that Mr. Silvers came to the shop around eleven o'clock that morning and asked if plaintiff had the money for the bill; that she told him she had informed Mr. Block that morning that she would pay the bill on the tenth of the month when she paid the rest of the bills; that Silvers said he must have something from the shop as "orders are orders;" that she told him there was nothing in the shop that belonged to him or his company; that he departed and returned in about half an hour when a Mrs. Gannon, a customer, was in the shop, and two of plaintiff's employees; that Silvers asked if she had made up her mind; that she told him she would pay the bill on the tenth of the month, but he said he

would have to take something as security; that she turned around and went to the back end of the shop, expecting Silvers would leave as she didn't want any commotion with a customer there; that while she was in the back end of the shop, she heard drawers slamming and came back and found Mr. Silvers unplugging her electric clipper from the socket and wrapping the cord around it, and said that he was taking it; that she told him, "You are not going to take that and turned to reach for them—I tried to pull his arm back and he grabbed me by my left arm and shoved me away from him. I said, 'You put that down or I am going to call the officers.' He said, 'Go ahead; call the officers.'" Plaintiff further testified that she reached in her money drawer to get money to call the officers but had no change and went next door, and when she was coming out of the store next door she saw Mr. Silvers get into his car with her clipper and leave. She testified she had paid $10 to Gibbs & Company for the clipper; that she never did get her clipper back; that she was very unnerved as a result of what took place on that morning; that she lived in the back of the shop and was afraid Silvers might come back; that she didn't sleep that night; that her arm was slightly discolored the next morning; that she went to a doctor about the end of August because of her nervous condition; that she didn't receive any medical attention immediately after the occurrence but was taking aspirins to quiet her nerves; that she lost sleep as a result of the incident as long as she stayed at that shop, which was about a month; that she was always afraid somebody might come to the back door or the front door.

On cross-examination plaintiff testified that she received an invoice for the merchandise which was brought by Mr. Silvers. Invoices were introduced in evidence as defendant's Exhibits 1 and 2, copies thereof, used as delivery tickets, being marked defendant's exhibits 3 and 4.

Plaintiff further testified that Mr. Silvers was introduced to her as a representative of the Western Hair and Beauty Supply Company; that she didn't know whether he represented any other company; that she noticed the invoices bore the name of the Western Hair Goods Company and had a doubt in her mind why that was there. She admitted that she joined the Western Hair Goods Company in her suit and that her affidavit in her petition to sue as a poor person asked leave to sue the Western Hair Goods Company, but insisted that when she was introduced to Mr. Silvers she was told he was working for Western Hair and Beauty Supply Company; that every time she spoke to Mr. Block he always referred to Mr. Silvers as his salesman. Plaintiff further testified on cross-examination:

"Q. You don't know what company Mr. Silvers was working for? Is that it? A. Well, he was from the Western Hair & Beauty Supply Company. On their bills they had 'Western Hair Goods.'

"Q. Do you know what company you did business with? A. Yes, I do.

"Q. What company? A. Western Hair & Beauty Supply.

"Q. When you received this merchandise from the Western Hair Goods, you were still doing business with the Western Hair & Beauty Supply Company. Is that right? A. I didn't pay any attention to that.

"Q. You dismissed as to the Western Hair Goods. Is that right? A. Well, I think it is.

"Q. You know they are two different companies, don't you? A. No, I don't. If they are, the first time—

"Q. Didn't you file a petition setting out they were two separate corporations? A. Yes.

"Q. So, then, you received this merchandise from the Western Hair Goods Company. That is correct, isn't it? A. Well, I thought I was dealing with the Western Hair & Beauty Supply Company."

The invoices bear the signature of plaintiff thereon, showing that the goods described therein were received by plaintiff from Western Hair Goods Company, 513 Olive Street, St. Louis, Missouri. The name Western Hair & Beauty Supply Company does not appear upon the invoices.

Plaintiff further testified that she was in the shop three or four weeks before she returned the equipment on which Mr. Block had a chattel mortgage; that when she took the shop over, she knew the equipment was covered by a chattel mortgage which Mr. Block later said was for $1172; that she didn't know there were any payments in arrears on those goods until Mr. Block called them to her attention; that she didn't receive any benefit from them and didn't want to keep them; that Mr. Silvers never talked to her about any past due payments thereon.

Edward M. Radloff, attorney for plaintiff, testified, as a witness in her behalf, that he was in court on February 7, 1941, in a prior trial of this case and heard Mr. Block testify that he was president of the Western Hair and Beauty Supply Company; and that he heard Mr. Block further testify that Mr. Silvers was his agent and employee, "that is, an agent and employee of the Western Hair & Beauty Supply Company."

Frank Carter, official court reporter of Division No. 18 of the St. Louis Circuit Court, testified that on February 7, 1941, as official court reporter, he reported the case of Eckner v. Western Hair & Beauty Supply Company. The witness produced a transcript of the notes of the testimony of Mr. Abraham Block made at that time, and, reading therefrom, testified that Mr. Block testified at said trial

that he was operating a business known as Western Hair and Beauty Supply Company with offices at 513 Olive Street; that Mr. Block testified he didn't at any time talk to plaintiff about the bill, but that the Western Hair and Beauty Supply Company showed the account as being charged to Patricia Eckner; that on that occasion Mr. Block testified, on cross-examination, that according to the records of the Western Hair Goods Company the order was charged to Miss P. Eckner; and that Mr. Block further testified he is president of the Western Hair Goods Supply Company; that when Mr. Block was questioned as to whether something was paid on the Eckner account, he said yes.

Mrs. Frank E. Gannon testified, as a witness for plaintiff, that she was a customer in plaintiff's shop prior to June 4, 1940, and was in the shop on that date when Mr. Silvers was in the shop; that Miss Eckner came to the front of the shop and spoke to him; that Silvers demanded money for a bill he said she owed; that Miss Eckner told him she didn't pay her bills until the tenth of the month and would pay it at that time; that Silvers said he was going to take something from the shop as security; that Miss Eckner left him in the front of the shop and went to the back; that witness didn't think Miss Eckner wanted to go any further because witness was there; that Silvers went over to the side, took the clippers from the table and disconnected them from the wall; that Miss Eckner said, "You can't take those clippers, they're mine," but Silvers didn't pay any attention and left the shop.

We are of the opinion that the question of whether or not Silvers was acting as agent of the defendant herein was one for the jury. Defendant did not see fit to call either Mr. Silvers or Mr. Block to the witness stand to deny or refute plaintiff's evidence but relied on documentary evidence, including the invoices and plaintiff's original petition in the case wherein plaintiff alleged that Silvers was the agent, servant and employee of Western Hair Goods Company and was acting on behalf of said company at the time mentioned. Said documentary evidence was introduced by defendant to show that plaintiff was dealing with Western Hair Goods Company instead of defendant company. It appears from the evidence that there were two companies with names nearly similar operating from the same place of business—513 Olive Street, and that Mr. Block was president of both companies and both companies were engaged, in a general sense, in the same kind of business.

We are unable to agree with defendant's view that its documentary evidence overcame the *prima facie* case made by plaintiff. It is true that in Darlington Lbr. Co. v. Missouri Pacific Ry. Co., 243 Mo. 224, 147 S. W. 1052, the rule is stated that, where evidence in rebuttal of plaintiff's case is in writing or is a matter of record and stands undisputed and completely destroys the case made by plaintiff, then it is proper for the court to declare the legal effect of such writing by

declaring as a matter of law that plaintiff is not entitled to recover notwithstanding a *prima facie* case previously made. However, in the case at bar said rule clearly does not apply because the documents relied on by defendant do not stand "undisputed." On the contrary, plaintiff's own testimony as well as that of her counsel and the official court reporter is such that notwithstanding the fact that the invoices are on the billheads of the Western Hair Goods Company, the jury could properly and reasonably believe that plaintiff nevertheless actually dealt with Silvers and Block as agent and president, respectively, of defendant company. Neither Mr. Silvers nor Mr. Block testified in the case so the evidence of plaintiff in this respect stands disputed only by the documents mentioned, which, under all the evidence herein, are far from conclusive. As to the abandoned petition of plaintiff, it is sufficient to say that even though it was an admission against interest, it was not conclusive against plaintiff. It was merely evidence to be weighed by the jury like any other admission. [Andrews v. Business Men's Acc. Ass'n, 283 Mo. 442, 223 S. W. 70; Moore v. Leach (Mo. App.), 14 S. W. (2d) 21.] We are of the opinion that the court properly overruled defendant's demurrers to the evidence in so far as the grounds just considered are concerned.

Defendant also contends that its demurrers to the evidence should have been sustained because there was no evidence of an assault on her proved by plaintiff. The reason advanced for this contention is that the witness Mrs. Gannon did not give any testimony regarding any assault by Silvers upon plaintiff, but that said witness testified that Mr. Silvers just took the clipper and walked out. In making this contention defendant ignores plaintiff's testimony wherein she said that Silvers grabbed her by her left arm and shoved her away when she told him to put down the clipper, and that she was going to call the officers. It will be recalled plaintiff further testified that her arm was slightly discolored the next morning as the result of Silvers' said actions; also that she had a nervous condition; that she lost sleep for about a month and was required to receive medical attention in August as a result of Silvers' conduct toward her. The fact that Mrs. Gannon did not give any testimony as to the actual assault cannot deprive plaintiff of the benefit of her own testimony on that question. We rule this point against defendant.

Defendant contends that the court erred in permitting plaintiff to testify as to the amount of the price of the merchandise involved. It is argued that the order itself constituted the best evidence of the amount. It is true that ordinarily an order purporting to show the amount would be the best evidence thereof, but we do not believe the admission of plaintiff's testimony in this case would furnish the basis for a reversal of the judgment because it is clear that the amount of the order was not the real issue in the case. The real issues were whether or not the defendant Western Hair and Beauty Supply

Company was the company from which plaintiff bought the goods, and whether or not Silvers was its agent and employee and while acting within the scope of his employment committed the acts alleged in plaintiff's petition, and whether plaintiff was damaged thereby. The fact that defendant points out it would have gained an advantage if its objection to plaintiff's testimony had been sustained, in that she would have been required to introduce the order in her own case thereby showing the goods were purchased from a different corporation, does not in our opinion constitute a good reason to hold that the court committed prejudicial error in overruling defendant's objection to said testimony.

The true purpose of a trial is to ascertain the true facts and apply the law, and a lawsuit should not be decided upon the basis of the skill or lack of skill displayed by counsel on either side in maneuvering for position. Furthermore, our statute provides that we shall not reverse the judgment of a court unless we shall believe that error was committed against the complaining party ''materially affecting the merits of the action.'' [Section 1228, Revised Statutes of Missouri 1939. ] We think the ruling of the court on this matter did not materially affect the merits of the case, and therefore overrule defendant's contention.

Another contention of defendant is that the court erred in refusing to give Instruction C which it offered. The instruction would have told the jury that they were licensed to assess punitive damages if they saw fit, but that this license did not mean that they were at liberty unrestrained to award any amount by way of punitive damages regardless of how much it may be, but ''to the contrary, exemplary or punitive damages should bear some reasonable proportion to the actual damages sustained.'' The case of Berns v. P. A. Starck Piano Co. (Mo. App.), 296 S. W. 239, is cited in support of defendant's contention. The fact that the instruction was in part taken from the language of the court in the Berns case, *supra,* does not prove that the trial court erred in refusing to give it. An instruction to a jury is one thing; the language of a court in discussing a legal proposition is quite another, as will be observed by a reference to all the language used by the court in the Berns case in discussing the proposition under consideration. In the case cited, the court, in addition to the language seized upon by defendant for its proposed instruction, said the following:

''It has ever been recognized that in cases such as this, involving personal torts, there is no scale by which punitive or exemplary damages may be graduated with certainty, and, consequently, the task is committed to the jury of examining all the facts and circumstances, and placing a valuation on the injury done.'' [Berns v. P. A. Starck Piano Co. (Mo. App.), 296 S. W. 239, 242.]

It will thus be seen that the instruction offered by defendant did not contain all the elements of a proper statement of the law of punitive damages in that it was so general that it could have misled the jury into the erroneous belief that there should be some mathematical relation between the amount of actual damages and punitive damages to be awarded.

In State ex rel. St. Jos. Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S. W. (2d) 351, our Supreme Court said there is no fixed relation between the amount of actual damages and the amount of punitive damages awarded; that they rest on different bases; that actual damages are compensatory and are measured by the loss or injury sustained, whereas exemplary or punitive damages are inflicted by way of punishment for the doing of an act maliciously "and are proportioned to the degree of malice, criminality or contumely characterizing the act, to the age, sex, health and character of the injured party, the intelligence, standing, and affluence of the tort-feasor and other like circumstances." It is obvious that, tested by the Supreme Court's decision in the last above case, the offered Instruction C was properly refused.

Defendant complains that the damages awarded by the jury on both counts are excessive. The amount of damages awarded on the second count was a matter within the discretion of the jury, and is not such as to warrant interference on our part.

The complaint as to the punitive damages allowed on the first count is, in our opinion, well taken. That count was based upon the conversion of the electric clipper valued at $10. The jury awarded $10, the value of the clipper, as actual damages on said count but should not have been authorized to consider or allow punitive damages on that count at all. The assault on plaintiff and the conversion of the electric clipper constituted really but one incident or transaction, and it was clearly erroneous for the court to permit the jury to award punitive damages for both the conversion and the assault. There was but one assault, and the circumstances attending it constituted the aggravation that formed the basis for the only punitive damages allowable under the evidence. A strict ruling would require us to say that the entire affair really constituted but one cause of action. It could have been brought in one count under which, properly pleaded, actual and punitive damages could be allowed. However, since the case was brought in two counts and tried by both parties as well as the court on that theory, we are of the opinion that the error as to the first count may be cured by a *remittitur*, there being no reversible error as to the second count.

It is not necessary that the second count be retried because our Supreme Court has held that parties should not be required to go through a new trial of an issue where there was no error in the first trial of that issue. [Hoelzel v. C. R. I. & P. R. Co., 337 Mo. 61, 78,

85 S. W. (2d) 126, 134; Borgstede v. G. H. Wetterau & Sons Gro. Co. (Mo. App.), 116 S. W. (2d) 179, 182, 183; Reichenbach v. United Masonic Ben. Ass'n, 112 Mo. 22, 20 S. W. 317.]

Therefore, if plaintiff will, within ten days after the filing of this opinion, remit the sum of $800 awarded as punitive damages on the first count of her petition, the judgment shall stand reversed and remanded with directions to the trial court to enter a new judgment in favor of plaintiff against defendant as follows: For actual damages on the first count, $10; for actual damages on the second count, $500, and for punitive damages on said count, $500, all aggregating $1010, with interest at six per cent per annum from the date of the original judgment; otherwise the judgment as to the first count shall stand reversed and the cause remanded for a new trial, and the verdict on the second count shall be held in abeyance by the trial court until the first count is retried and disposed of, after which judgment shall be entered on the second count as herein directed together with judgment on the first count in accordance with such verdict as may be found on said first count.

*Hughes, P. J.,* and *Anderson, J.,* concur.