Thomas Earl HACKETT, a Minor, by Paul Hackett, His Next Friend, Plaintiff-Respondent,

v.

WABASH RAILROAD COMPANY, a Corporation, and Anthony D. Williams, Defendants-Appellants.

No. 43689.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 11, 1954.

J. H. Miller, St. Louis, Hunter, Chamier & Motley, Moberly, for defendants and appellants.

C. M. Hulen, Moberly, for plaintiff and respondent.

VAN OSDOL, Commissioner.

In this case plaintiff, Thomas Earl Hackett, recovered a judgment of $12,000 dam-

ages for personal injury against defendants-appellants Wabash Railroad Company and its engineer. Plaintiff, a minor seven years of age, was injured July 12, 1951, when a northbound Wabash steam locomotive drawing a train struck the eastbound "pickup" truck in which plaintiff was riding. The collision occurred at a grade crossing about one and one-fourth miles south of Moberly. At this point the Wabash single-track (north-south) line is parallel with the single-track line of Missouri-Kansas & Texas Railroad Company (the Katy), the Katy track being approximately one hundred or one hundred five feet to the westward. East of the Wabash track lies U. S. Highway No. 63. Coming from the south, Highway No. 63 is parallel with the Wabash line, but a short distance north of the crossing the highway curves somewhat to the northeastward.

The truck in which plaintiff was. riding had been moving eastwardly on an east-west highway (Rock Road). The truck was owned and was being driven by plaintiff's father; and plaintiff and his brother Sammy, nine years old, were standing up in the bed of the truck just behind the cab. They were holding to the stakes of a stock rack mounted to the rear of the cab of the truck. One Martin Grislona was riding in the cab with plaintiff's father.

Plaintiff's father, Paul Hackett, testified that in driving the pickup truck on Rock Road, a heavily traveled highway, toward U. S. Highway No. 63, he had progressed across the crossing of the Katy and was moving along Rock Road toward the crossing of that road over defendants' line. Rock Road at this point is not quite eighteen feet wide, and is of gravel. Between the Katy track and the Wabash line, Rock Road "dips" and continues to dip until one starts up the grade to the Wabash crossing. The witness looked both ways and didn't see a train. He didn't hear a whistle or bell. If a whistle or bell had been sounding, he could have heard it. His pickup truck was a new one the noise of which would not have interfered with his hearing a whistle or bell. He was moving five to seven miles an hour, and could have stopped in two or three feet. The witness testified, "I didn't know I was hit until after I got out and the train was just almost by, I suppose two coaches left." The engine had struck the bed and rack of the truck, and the back wheels of the truck "were gone." Plaintiff was lying unconscious six to ten feet from the crossing, and about three feet from the track; his head was bleeding.

The witness, Paul Hackett, further testified there were weeds to the southward between the Wabash and Katy tracks. He supposes the weeds were three or four feet high, and he thinks the weeds extended up to the Wabash ballast. The weeds had been cut, "just a little narrow strip", for some hundred fifty feet south of the crossing. The weeds had been cut "quite a while before the day of the accident." There is a "dump" in the middle of the right-of-way (between the Wabash and Katy tracks) about one hundred fifty feet south of the crossing. The witness had looked north and south when he was between the tracks. He was as close as twenty-five feet to the Wabash track when he looked. He said, "Well I guess I was listening." He again said, "I am going to tell you I was listening." He thinks he has good hearing. He wears glasses only when he reads.

The witnesses, plaintiff and his brother Sammy, did not hear a whistle or bell. They testified they could have heard a whistle or bell if it had been sounding.

A witness who resides on Rock Road just west of the crossings did not hear. a whistle or bell. However, as the Wabash train approached, this witness was mowing his yard with a power mower, and his young son was "traveling around" the yard on a motor scooter. Both of these machines were running at the time and making a noise. The witness mentioned "a rise in the ground (between the Wabash and Katy tracks) a half quarter south of that rock road * * * and a mound of dirt." He had never paid any particular attention to the height of the rise, but one "can see trains running on the other side of it * * *."

Defendant Anthony D. Williams, engineer and in charge of the Wabash locomo-

tive, witness for defendants, testified that the train, as it moved northwardly approaching Rock Road, was going between seventy and seventy-three miles per hour. The train "may have been" about thirty-eight minutes late. "The engine was working in its fullest capacity." The sun was still shining. Being on the right (east) side of the steam engine, the witness did not see the pickup truck approaching from the west. "I saw him and he was hit practically all at the same time." The witness was sounding the whistle for the crossing when the engine struck the truck. He let go of the whistle lever, and set the emergency brakes. He had given the "regulation standard crossing whistle." The bell was also ringing.

The fireman was not looking. He was not seated on the left in the cab of the engine and never saw the approach of the truck. He "was up" shutting off the steam. However, he said the whistle had been blown, and it was still blowing when the impact occurred. The bell was also ringing. Other witnesses for defendants testified that the whistle was blowing, although some of these witnesses were not in a position to hear the bell, assuming it was in fact ringing.

Defendants' steam-propelled locomotive measures sixteen feet from the rail to the top of the smokestack.

Witnesses for defendants testified of the physical condition and elevation of the ground lying between the Wabash and Katy tracks and to the southward of Rock Road. The Wabash track is a little over three feet higher than the "ground line" of Rock Road between the Wabash and Katy tracks. About three hundred fifty feet south of the crossing the ground line of the right-of-way is higher than the top rail. There is an old road bed just west of the Wabash track, the elevation of which is one or one and one-half feet lower than the top rail of the present track. A witness for defendants testified that, standing at a point in the center line of Rock Road twenty-five feet west of the Wabash crossing, one can see "practically all the top of the rail down as far as,

I'd say about 650 feet south of the crossing." Defendants also introduced evidence tending to show the sight distances down the Wabash track, the observer standing on Rock Road at various distances to the westward of the crossing. Generally, defendants' evidence tended to minimize the obscuring effect of the elevation of the land, and the vegetation thereon, to the southward between the Wabash and Katy tracks.

Defendants-appellants contend the trial court erred in overruling their motion for a directed verdict. Defendants assert the action is based on common-law negligence, and there was no common-law duty of defendants to give a warning by bell or whistle in the circumstances of this case. Supporting their contention defendants say there was no evidence of any extraordinary circumstances of user or of obstructions to view at the crossing in question; the father of plaintiff, driver of the pickup truck, had the duty to look and listen and if he had done so he could have seen or heard the approach of the train, and his testimony that he looked and did not see the train was contrary to the physical facts and should be disregarded. Defendants-appellants urge that, consequently, the driver must be held to have seen the train and a warning was unnecessary; and, since the issue of warning was out of the case, the negligence of the driver was the sole proximate cause of plaintiff's injury. On the question of the submissibility of plaintiff's case, defendants-appellants also contend there was no substantial evidence that defendants failed to give a warning of the train's approach. And defendants-appellants further contend that the trial court erred in giving plaintiff's principal (only) verdict-directing Instruction No. P-3; and that the amount of the verdict was excessive.

We have examined these contentions of defendants-appellants relating to the submissibility of plaintiff's case, and relating to asserted error in giving plaintiff's Instruction No. P-3. We are of the opinion that plaintiff made out a case for the jury as submitted by the instruction, and that any errors in the instruction were not prejudicial under the facts of the case. At the

outset and before discussing the defendants-appellants' contentions, we shall resort to the instruction for an explanation of the theory of plaintiff's case.

Plaintiff's Instruction No. P–3 hypothesized that plaintiff was riding as a guest in the truck; that the truck was crossing the tracks of defendant Wabash; that the truck was struck by a Wabash train operated by defendant Williams who was in the employ of defendant Wabash; that plaintiff was injured; and that plaintiff was in the exercise of ordinary care. The instruction continued, as follows,

"* * * and if you further find from the evidence that the place where the accident‧ occurred was a crossing over the defendant Wabash Railroad Company's tracks, which was used by persons and vehicles as a crossing over the defendant Wabash Railroad Company's tracks, and that the defendants, in the exercise of ordinary care, should have anticipated that persons or vehicles might be on or crossing said tracks at said place, then it was the duty of the defendants to give a timely and adequate warning of the approach of a train, when one of said defendant Wabash Railroad Company's trains was approaching said crossing, and the failure of the defendants, if they did so fail to perform this duty, would be negligence. If the jury find defendants guilty of negligence, as above set forth, and if you further find that the injuries to the said Thomas Earl Hackett, mentioned in evidence, were directly caused either by such negligence of the defendants, if negligence, or that such negligence of the defendants, if negligence, combined with the negligence of the driver of the truck so as to directly cause the injuries to the said Thomas Earl Hackett, then your verdict will be for the said Thomas Earl Hackett."

(Parenthetically, we note the instruction is in substance like the refused Instruction B, which the court said a trial court erred in refusing in Peppers v. St. Louis-San Francisco R. Co., 316 Mo. 1104, 295 S.W. 757. But we realize that this court in reviewing the Peppers case was not considering Instruction B with a regard for such contentions as are made by defendants-appellants as to Instruction No. P–3 upon this appeal of the instant case.)

Examining the instruction (No. P–3) it is seen that plaintiff undertook to submit common-law negligence of defendants in failing to give a timely and adequate warning. Although plaintiff had stated a claim in part based on the alleged failure of defendant Wabash to perform the statutory duty of sounding a whistle or bell, Section 389.990 RSMo 1949, V.A.M.S., no such submission was proffered by plaintiff, and the instruction (No. P–3) submits plaintiff's case as against both defendant Wabash and its engineer, defendant Williams. See Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S.W.2d 126.

The common law recognizes the duty of a railroad (and its engineer in charge of its engine) approaching a public crossing to exercise ordinary care to prevent injury to persons or property on or dangerously near the crossing. Railroads, generally having priority of right-of-way over highway crossings, are obliged to signal the approach of their trains so that the traveler on the highway is warned of the approach whenever danger to persons or property may reasonably be anticipated. The means of the warning should be commensurate with the danger to be encountered by the highway traveler in the circumstances and should be timely. Generally the means employed for the warning of a train's approach is the sounding of a whistle or the ringing of a bell. Our statute (§ 389.990, supra), requiring a warning or the ringing of a bell, did not do away with the common-law duty of a railroad to signal the approach of its trains. The statute is but cumulative of the common law, and the statute only provides the minimum requirements of the means and the timeliness of warnings at highway crossings. The questions of negligence at common law in failing to take the precaution of giving a warning, and of the timeliness and ade-

quacy of a warning given are generally jury questions. On the other hand, the highway traveler has the reciprocal duty when approaching a railroad crossing to exercise the prescribed standard of care for his own safety. Both the railroad and the traveler have the duty of keeping a lookout for danger. These duties are equal and reciprocal. A railroad has no right to expect a clear track at public crossings, or at other places where it has actual or constructive notice that people are habitually using its track. At such places, the railroad must keep a lookout. Likewise, railroad tracks themselves are signals of danger and the traveler approaching the tracks must look out in the exercise of care for his own safety. Hoops v. Thompson, 357 Mo. 1160, 212 S.W.2d 730; Flint v. Chicago, B. & Q. R. Co., 357 Mo. 215, 207 S.W.2d 474; State ex rel. Kurn v. Hughes, 348 Mo. 177, 153 S.W.2d 46; Gorman v. Franklin, Mo.Sup., 117 S.W.2d 289; Hoelzel v. Chicago, R. I. & P. R. Co., supra; Boland v. St. Louis-San Francisco R. Co., Mo.Sup., 284 S.W. 141; Zini v. Terminal R. Ass'n of St. Louis, Mo.Sup., 250 S.W. 47; Jackson v. Southwest Missouri R. Co., Mo.Sup., 189 S.W. 381; 44 Am.Jur., Railroads, § 513, pp. 755–756.

■ In the instant case the crossing involved was admittedly a public crossing. Considering the evidence (relating to the nature of the terrain surrounding the crossing; relating to the "dip" in Rock Road; and relating to the growth of weeds or other vegetation in the area between the Wabash and Katy tracks) from a standpoint favorable to plaintiff, the approach of a northbound train was at least partially obscured from the view of an eastbound traveler remotely approaching Rock Road crossing until the train came to some point which the jury could have reasonably found was approximately one hundred fifty feet south of the crossing, although as the traveler neared and closely approached the crossing the extent of the sight distance was extended until he had a view many feet farther to the southward. Moving at the rate of speed he said he was, it would seem the truck driver could have seen the train and could have stopped and avoided the collision if he had looked as he said he did even after he had come to the point where he said he looked, twenty-five feet from the crossing. It may be that he did not look, or that he did not look carefully. However that may be, for the purpose of reviewing this case, we shall assume that the driver of the truck was guilty of negligence in failing to look and that such negligence was a proximate cause of plaintiff's injury. This does not mean that defendants are not liable to plaintiff for their negligence, if any, in failing to give a warning of the approach of the train or that the negligence of the truck driver was the sole proximate cause of plaintiff's injury in this case wherein plaintiff was a guest and wherein the negligence of the truck driver was not imputable to plaintiff. (It was not pleaded, nor is it contended that plaintiff was contributorily negligent.) Defendants are liable if they were negligent as submitted, and if their negligence was a proximate cause concurring with the causal negligence of the truck driver in injuring plaintiff. Reynolds v. Thompson, Mo.Sup., 215 S.W.2d 452; Gorman v. Franklin, supra; Peppers v. St. Louis-San Francisco R. Co., supra.

■ Without completely restating the negative evidence upon the issue that a whistle or bell was not in fact sounded, we express our opinion that such evidence was of sufficient probative force to constitute substantial evidence that no such warning was given of the approach of defendants' train, notwithstanding defendants' positive evidence to the contrary. The truck driver testified he was listening, and he and his sons, plaintiff and Sammy, were all in close proximity to the track and in positions to have heard a whistle or a bell if either was in fact sounded. See and contrast Knorp v. Thompson, 357 Mo. 1062, 212 S.W.2d 584, 5 A.L.R.2d 103.

There being substantial evidence that defendants gave no warning of the train's approach, we now take into account the admitted fact that the crossing involved was a public crossing, and we shall accept as

true the testimony of the truck driver that the highway, Rock Road, upon which the truck was moving eastwardly toward and up onto the crossing, was a heavily traveled highway. We furthermore notice the evidence introduced tending to show the obscuring effect of the vegetated terrain south of the crossing and between the Wabash and Katy tracks. But what is most important in this case is the fact that defendants were not looking. As shown by defendants' own evidence, the truck was not or could not be seen by the defendant engineer seated as he was on the right (east) of the cab of the engine of the fast-moving train, and the engineer and the fireman both testified that the fireman was not at his post on the left (west) side of the cab. Plaintiff did not seek to recover on primary negligence in failing to keep a lookout. But failure to keep a lookout for the approach of east-bound highway travelers on Rock Road was a circumstance, a fact in this case, established by defendants' evidence. Now, in addition to the obscuring effect of the terrain south of Rock Road, the operation of defendants' train in approaching the crossing was a "blind" one with respect to any view of defendants to the westward. The fact or circumstance of defendants' failure to look out was a fact in effect as if there had been an obstruction (west of the Wabash track and down to Rock Road crossing) which completely obscured *defendants'* view of the approach of the eastbound traveler on Rock Road. In these circumstances, the least that could be reasonably said is that one in the exercise of ordinary care should have taken the precaution to give a timely and adequate warning of the train's rapid approach to the busy public crossing, and that the failure to do so was negligence.

Inasmuch as the user of the highway was hypothesized and submitted in plaintiff's verdict-directing Instruction No. P–3, which submission of user was supported by the admitted fact that the crossing was a public one, and by the evidence that Rock Road is a heavily traveled highway; and inasmuch as defendants' rea-sonable anticipation of danger was also hypothesized and submitted (although somewhat imperfectly) we cannot see that the instruction was prejudicially erroneous, under the facts of this case.

In connection with the submission, in Instruction No. P–3, of failure to give a timely and adequate warning, defendants-appellants contend the jury was given a "roving commission" to determine the kind of warning defendants should have given. In making this contention, defendants-appellants say the jury may have believed the testimony of defendants' witnesses that a whistle and bell were sounded and yet have found for plaintiff on the theory that other means of warning should have been utilized at the crossing, for examples—a flagman, a gate, or an automatic bell or other automatic warning system. But the only evidence introduced on the issue of warning tended to negative or to prove that a whistle or bell was sounded. And, as defendants-appellants have stated in their brief, plaintiff did not argue that any duty rested on defendants to have given any kind of a warning other than by whistle or bell. Plaintiff did not plead or contend the circumstances demanded the duty to take the precaution of using any means of warning other than by whistle or bell. We believe there is no real substance in this contention.

Was the jury's award, $12,000, excessive?

In considering this question we shall view the evidence of the nature and extent of the plaintiff's injury from a standpoint favorable to plaintiff.

It is inferred that the impact of the collision threw plaintiff violently from the truck and against some object. He suffered a compression fracture of the skull in the left parietal region. The parietal bones are located "behind the center of the skull * * * One on each side of" the medial line. Plaintiff was rendered unconscious and was taken to a hospital. He had neurological symptoms. He was examined by X-ray. The fractured portion of the skull

was observed, and was later removed by surgery. No injury to the meninges was noted. When the operation had been performed the neurological symptoms immediately subsided, although plaintiff continued to be unconscious "for a time." Plaintiff remained in the hospital for eighteen days.

An opening was left in plaintiff's skull at the place where the fractured bone was removed. The opening or hole in the skull is one and a half centimeters in size—approximately one-half inch. The hole in the bony substance will remain. Scar tissue has developed at the site of the wound; but there is little possibility, if any, of the development of bone protection by calcium discharge. The likelihood of injury to the brain tissue by a blow sustained in that area would be greater "than any place else." While a physician said the possibility of sustaining a blow in that area is a rather remote one, yet "if he should be hit by a sharp object in that particular spot, it would be more likely to penetrate." Severe damage to the brain tissue at that particular place might cause some paralysis of the right side, inasmuch as it's fairly close to his "motor area." Plaintiff goes to school and makes "pretty good" grades. But his father testified that plaintiff is nervous; that "ever so often" plaintiff comes home from school crying; says he has a headache; doesn't eat supper; and goes to bed. It seems that he has no permanent disability or other serious injury than as stated.

No case has been cited in which the question of the excessiveness of an award has been considered and in which case a permanent injury was of the unusual nature as here. And, in our research, we have not found a case wherein there was a comparable injury—such a case as might be of value to us in applying the desired standard of reasonable uniformity. However, two cases cited by defendants-appellants merit notice, and call for differentiation. See Olian v. Olian, 332 Mo. 689, 59 S.W.2d 673; and Rosenkoetter v. Fleer, Mo.Sup., 155 S.W.2d 157. In the Olian case, decided in 1933, plaintiff, a boy thirteen years old, received a hair line fracture of the skull some three inches in length, but there was no depression. A doctor would not even say the fracture extended through the inner bone of the skull. As did the plaintiff in our case, the plaintiff in the Olian case made a good recovery. This court said the verdict ($8500) in the Olian case was large and seemingly excessive. In the Rosenkoetter case, decided in 1941, plaintiff, a boy six years old, had suffered an extensive lacerated wound over the right temple which left a permanent discoloration and scar. He had no broken bones and no skull fracture. This court held the verdict ($10,000) was excessive. In these cases, of course, the injuries were not like that sustained in the instant case wherein the evidence shows that a fracture of the skull left the vital tissues of the brain permanently unprotected by bony structure and consequently more vulnerable to the possible hazard of future serious incapacitating or fatal injury.

■ It was the jury's province primarily to assess such damages as would reasonably compensate plaintiff for his injury. Moreover, in passing upon defendants' motion for a new trial, the trial court tacitly approved the amount of the jury's award. In this situation, and without precedent of a case involving a comparably peculiar injury, we do not wish to arbitrarily say the instant award was manifestly out of proportion to the injury suffered.

The judgment should be affirmed.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.