Adeline Doris BALDWIN, Administratrix of
the Estate of Albert G. Baldwin,
Jr., Deceased, Appellant,

v.

The ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, a Cor-
poration, Respondent,

Harold C. Moore, Defendant.

No. 52730.

Supreme Court of Missouri,
Division No. 2.

April 8, 1968.

Lyman Field, Rogers, Field & Gentry, Kansas City, for appellant.

Sam D. Parker, Jack W. R. Headley, Joseph E. Stevens, Jr., Kansas City, for defendant-respondent, Lathrop, Righter, Gordon & Parker, Kansas City, of counsel.

EAGER, Judge.

This case arises out of injuries to an automobile passenger suffered in a crossing accident. The collision occurred in the outskirts of Lawson (Ray County), Missouri, at about 12:10 p. m. on January 8, 1964. The original plaintiff Albert G. Baldwin, Jr., T. R. Gray and Harold Moore were proceeding north on a gravel road in Moore's 1962 Ford; the extreme front of the car was struck, while stopped on the crossing, by a Santa Fe twenty-one car freight train with two diesel units traveling on the branch line that ran from Henrietta to St. Joseph. These three men were members of the National Guard and were then regularly employed at the "Nike Base" located (by road) a little over two miles southeast of Lawson. They were, at the time, going into town for lunch. Plaintiff was sitting on the right side of the front seat, Gray in the middle, and Moore was driving. The train came from the east, which, of course, was on their right side. Plaintiff sued both the Santa Fe, as we shall call it for convenience, and Moore. The jury brought in a verdict for $50,000 against both. The trial court overruled Moore's after-trial motions and he appealed, but later dismissed his appeal. The Court sustained defendant Santa Fe's motion to set aside the verdict as to it and to enter judgment in accordance with its motion for a directed verdict; in the alternative the Court sustained Santa Fe's motion for a new trial on three stated grounds. Plaintiff appealed. We are thus only concerned with the issues between plaintiff and Santa Fe.

Plaintiff's case was pleaded and submitted on three issues of primary negligence, namely: (1) in permitting weeds, brush and undergrowth to obscure the vision of those so approaching the crossing from the south; (2) in failing, through its employees, to keep a careful lookout; and (3), in failing, through its employees, to give "adequate and timely warning" of the approach of the train. Defendant pleaded and submitted contributory negligence on

the part of plaintiff in failing to see the train and warn Moore, after undertaking to keep a lookout. Plaintiff suffered serious injuries, which fact is substantially undisputed. However, in October, 1965, he suffered a coronary occlusion with considerable resulting disability; there is much controversy concerning the cause of that. After the appeal was taken plaintiff died, and his administratrix has been substituted as appellant. We shall continue to refer to Mr. Baldwin as the plaintiff.

It may clarify matters if we state the substantive contentions of the parties in reverse order, and before proceeding to a further factual statement. Defendant insists: (1) that plaintiff's evidence did not make out a submissible case because none of the submitted grounds of negligence was a proximate cause of the collision; (2) that plaintiff was guilty of contributory negligence as a matter of law; and (3), in the alternative, that the Court correctly sustained the motion for a new trial because there was no substantial evidence to support the submission in plaintiff's Instruction No. 3 of obstructed vision or of the failure to keep a lookout. Inherent in the first two of these contentions is the insistence that plaintiff was conclusively bound by his testimony allegedly showing that he could have seen the train in time for an effective warning to the driver. Plaintiff counters all these contentions, asserting: that there was substantial evidence to support all three charges of negligence and the element of proximate cause as to all three; that plaintiff was not guilty of contributory negligence as a matter of law, his allegedly binding statements being mere estimates and not judicial admissions, and that there was ample evidence to support every disjunctive submission in plaintiff's Instruction No. 3. These opposing views may, we hope, be further clarified when the evidence is discussed.

The record is voluminous and the exhibits are many. The contentions require a discussion of the evidence in detail. When these men left their place of work at about noon, they traveled first south on a macadam road inside the base, then west for a mile or a little more on a gravel road, thence north a mile or so on the same gravel road to the place of collision. The railroad ran substantially east-west at the point in question, although veering a little to the northwest. The car was stopped with its front end over the first rail or within the overhang; it was knocked into the ditch at the southwest corner of the crossing, and landed on its top. There was much evidence concerning weeds, brush, and sumac bushes, all of which leaves one in some doubt as to the precise situation. It was conceded that there were uncut weeds along the right-of-way to the east, and photographs taken by defendant's claim agent on the next day show this. There was also a fence along the south side of the right-of-way with some weeds and brush along it, and the ground level at this fence appears to be substantially above the level of the rails at most points. The exhibits show considerable unidentified trash, vines or brush in some parts of the fence along the east side of the gravel road, which would not be the railroad's responsibility, but which did, to some extent, obscure the vision. Along the railroad and at some unascertained distance east of the crossing a cut or embankment began, getting much deeper as one proceeded on east. Brush is shown growing substantially all over that embankment, some rather high. It is impossible to tell from the photographs or the testimony just where the higher brush began, but there is a fair inference that some of it extended west of the embankment, perhaps to a point within 150-200 feet of the crossing (D's Exhibit 6a). Plaintiff offered, and the Court received, a plat prepared by an engineer in May, 1965; it was received for what it might be worth as of that time. It showed weeds and brush one and one-half to three feet high along the south part of the right-of-way from a point near the crossing to a point perhaps 165-170 feet east; from thence eastward to 300 feet the brush was shown to be from four to seven feet high,

all measured from the rail. The diesel locomotives were 14-15 feet in total height.

Plaintiff testified definitely that his window (right) was rolled down; further: that he heard no whistle of any kind at any time until the train was within 15-20 feet of the crossing; that the crossing was "just about a blind crossing" for a car approaching from the south (to which there was no objection); that he began looking for a train perhaps 300 yards back; that beginning at about 100 feet south of the crossing Moore slowed the car to about 15 miles an hour; that he, plaintiff, continued to look "both ways" for a train, but did not see it until the car was about 30-40 feet from the track; that all three apparently saw it at about the same time, Gray yelled something, and Moore "slammed on" the brakes; that the train was about 90-100 feet away when he saw it, but it did not whistle; that the diesel whistles or horns were loud and could be heard easily for a distance of a mile; that he heard no bell and saw no headlight. Defendant bases its principal defenses upon a statement made by plaintiff on cross-examination. Plaintiff had testified that he was both listening and looking. When asked how far he could see east when 100 feet back from the crossing he said: "I don't know. Not too far"; when pressed further on the point he said: "Down to the east, I would say, possibly 200 feet." He further testified that at 75 feet, "It didn't improve your view very much * * * Possibly a little"; that at 50 feet "I wouldn't know without measuring the distance. I don't know * * *"; that "You couldn't see too far down the track until you got right up on the track on account of the cut." He finally "guessed" at the figure from 50 feet and his guess was stricken. He testified that one could not see farther east because of the "weeds, brush, railroad cut"; that he looked east "far more than once," that he glanced east and glanced west "as at any crossing" and that he was looking "as far down the track as he could see"; also, that the cut or embankment

was involved "to a small part" in obscuring the vision; that in his judgment it would be about 300 feet to the "deep part" of the cut.

Mr. Gray testified: that he first saw the train when they were 30-40 feet south of the crossing and the train was 75-100 feet east and that it was not whistling; that the car was moving at probably 20-25 miles an hour; that he made an exclamation; that the car was stopped but not soon enough to clear; that he did not know how far one could see east from 30-40 feet south of the crossing; that he heard no whistle until the train was "about ready to hit us," 15-20 feet away, and after the car had stopped. Defendant Moore, the driver, called for cross-examination, testified: that his car was in good condition; that he heard no train whistle in the whole distance of perhaps two miles which he traveled from the Nike Base; that it was plaintiff's "habit" to have his window down; that he first saw the train when the car was about 25 feet from the crossing and the train was then "possibly" 100 feet east; that he was familiar with the crossing and that it was "partially blind"; that someone "hollered" at about the same time he saw the train, and at that time he first heard a whistle; that the embankment or cut, the fence row, and the weeds partially obscured the view; that he knew that this was a bad crossing and that there was no necessity for plaintiff to tell him that; that in view of this, he had slowed to 10-15 miles an hour, perhaps 15; that he was listening for a whistle, because he knew it was a bad crossing; that he had been looking both ways all the time during his approach; that he managed to stop, almost in the clear; that he had no estimate of the train's speed; that if the whistle had been sounded at "twice the distance" he would have had ample time to stop; that the Santa Fee whistles could be heard for a mile and the bells were also loud, but he heard no bell.

Two other employees who left the Nike Base in separate cars shortly after plaintiff

and arrived at the scene very shortly after the collision, testified that they heard no whistle during their travel of two miles or more; no exact times were specified. One of these had seen the train near the Base some two miles more or less from the crossing. James R. Hightower, a highway patrolman, arrived at the scene a little more than an hour after the collision. The train was backed up to a point east of the crossing; he says that this was at his suggestion (denied by the crew) in order to give him some idea of how far a person could see the train. He testified further: that in the backed-up position the engine was approximately 300 feet from the crossing; that he remembered brush 6-8 feet high on the bank; that in viewing the train as backed up, he did so from his car located 70 feet south of the crossing; that there was brush "to a degree" in the direction a driver would have been looking; that (somewhat confusingly) he did not try to determine "whether there was in fact an obstruction for the vision of the driver * * *."

Defendant's evidence came from the conductor, a brakeman, the engineer, the fireman, and the claim agent; the latter took photographs and statements. The engineer could not see the car until it had stopped on the track. He testified (by deposition): that he started the crossing whistle, actually a diesel horn, at the whistle post some 1900-2000 feet east of the crossing and continued it until he had passed the crossing; that the bell was also rung, but later; that in coming up grade to about the center of the cut they had been traveling at the speed limit (on that line) of 30 miles an hour, but that he then reduced the speed to 25 as they came over the crest; that the latter speed was continued to the time of collision; that when the engine was about 25-30 feet from the crossing the fireman yelled that a car was not going to stop and both he and the fireman "went in emergency"; that the left front step of the engine struck the car just behind the bumper; that the train continued to travel for twenty-one car lengths; that they later backed the train to a point east of the crossing "to sort of figure out just where this embankment was or something. I don't know." Also, that a reason was "to figure out a view"; that he thought the train was backed to a point around 300 feet from the crossing; that probably the fireman told him where to stop; that he looked out from the fireman's side after the train was backed up and he could see down the road for about 400 feet. Near the conclusion of his testimony he said that at about 150 feet from the crossing the fireman said that a car was "approaching." This witness had been "restricted" to the branch line as a locomotive engineer, apparently on account of his health; at the time of this collision he had just gotten out of the company hospital after a five-day checkup, made because he had been "losing some time." The speed limit on this line, fixed by the defendant, was 30 miles an hour at all places.

James R. Claypole, the fireman, testified in substance: that it was his duty to keep a "sharp lookout" ahead and to the left; that the engineer had sounded the crossing whistle from the whistle post; that when they were approximately 150 feet east of the crossing he first saw the car, about 150 feet down the road, but that there was then nothing to suggest that it would not stop; that he "commented" to the engineer that a car was "approaching" and that the engineer then began "short blasts" of the whistle as an alarm and continued these to the time of impact; that the car slowed at a point about 40-50 feet from the crossing, then picked up speed "for a second," and failed to stop short of the track; that when the car was about 35 feet from the crossing, he jumped up and yelled at the engineer and put the train into emergency. He further testified that they later backed the train to the point from which he had first seen the car, which was approximately 150 feet east of the crossing; that he located this point, in part, from the telephone poles. On cross-examination he es-

timated that the alarm whistle actually began at about 96 feet, that the whistle could be heard with car windows closed at a distance much greater than 300 feet, and that he knew that this particular neighborhood was in somewhat of a boom because of the Nike Base. In conclusion, he testified that he could not explain why he did not see the car sooner.

The claim agent identified various photographs which he had taken on the next day; these were taken from his eye level, and he was six feet three inches tall. There was evidence that the eye level of one sitting in a car would be approximately three feet, nine inches from the ground. The conductor, Louis Engelhard, took several photographs at the scene, including one (Defendant's Exhibit 23) of the train standing at the place to which it was backed up, which he described as about 150 feet east of the crossing; this photograph was taken from the road at a point which he first estimated to be 75 feet, but later reduced to 30 or 40. He was in the rear car at the time of collision, and "could" not hear any whistle (it is not entirely clear what this means); he testified that the train was backed up, at least in part, to show the point from which the fireman first saw the car; that there was uncut brush on the right-of-way.

The testimony of the brakeman, James E. Cook, added nothing really material to the evidence recited; it was somewhat in conflict with that of the fireman and engineer in that he stated that "short blasts" were begun about 200 feet from the crossing. Some evidence indicated that there was a slight "dip" in the road south of the crossing or, as fireman said,—a "build-up" to the crossing from the south. Some of the photographic exhibits were taken by a professional photographer from Excelsior Springs, almost immediately after the collision. They were received in evidence, but it was not shown how he happened to be there. In the view we take of the case it is not necessary to digest the rather voluminous medical testimony, or the lay testi-

mony of plaintiff's condition and of his prior and subsequent activities. We feel somewhat apologetic for the length of this statement of facts but, in the final analysis, the decision here is more nearly one of fact than of law.

Defendant's contention that there was no substantial evidence for a submission of the case is based upon its construction of the plaintiff's testimony which, counsel say, was a judicial admission. The same construction is used for the claim that plaintiff was guilty of contributory negligence as a matter of law. In their essence, both claims are that plaintiff is conclusively bound by his testimony that he was definitely looking because he knew it was a bad crossing, and that from a point 100 feet south "he could see 200 feet down the track to the east." (Quoted from page 8 of defendant's brief.) Thus, defendant says that he *could* see for 200 feet, he was *charged* with seeing the train at that distance, he had a duty to warn the driver immediately, and that there would then have been ample room to stop. Counsel cite cases to the effect that to look is to see that which is *plainly visible*. Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885; Pipes v. Missouri Pacific R. Co., Banc, Mo., 338 S.W.2d 30. Counsel have set out rather elaborate calculations as to speeds and stopping distances in an effort to establish those supposedly conclusive determinations, all being based on the positive fact that plaintiff had a clear view of the train when it was 200 feet east. However, all is not quite that simple. In the first place, plaintiff's testimony, both in the statement so firmly relied upon and subsequently, was not so positive and unequivocal as thus argued. We have set out the material parts of his testimony and shall not repeat them here, verbatim. We note, however, that plaintiff first answered that he *did not know* the distance one could see from a point 100 feet south, but not "too far," then said when pressed further, "*possibly* 200 feet"; he was very uncertain about the view as one drew closer to the tracks, thought that it might be improved a little,

stated that he wouldn't know "without measuring the distance," and that one could not see "too far" until he got right up on the track; thereafter he began to "guess."

There is no doubt that if Moore had applied his brakes when he was 100 feet south of the crossing, or even one and one-half seconds later (at 15 miles an hour or even 20) he could have stopped short of the track. But defendant's contentions are all based upon the supposed judicial admission of the sight distance, plus the duty of an immediate warning at that point, *and the fact that plaintiff was looking east at that moment.* Plaintiff testified that he was actually looking both ways and the evidence does not pinpoint which way he was looking at any specific point. He was, in fact, required to watch with ordinary care both ways, and was not required to look continually in either direction, Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918, 923; a careful glance to the west, to which he was entitled, beginning at 100 feet south of the crossing, could easily have accounted for the loss of a crucial two or three seconds. Considered in the full context of plaintiff's testimony on the subject, we hold that he made no judicial admission and that the answer relied on was, in fact, an estimate; also, that he is not to be charged legally with having looked in one particular direction at a given specific point. The general rule is well established that a plaintiff is not bound by his estimates of time, speed or distance, but he may rely on other testimony not at war with his own theory. McDonough v. St. Louis Public Service Co., Mo., 350 S.W.2d 739; Appelhans v. Goldman, Mo., 349 S.W.2d 204; Lay v. Mc-Grane, Mo., 331 S.W.2d 592; Rawley v. Eilermann Transfer Co., Mo.App., 390 S.W.2d 937; Henrickson v. Resnik, Mo.App., 390 S.W.2d 610. For specific applications of the rule to railroad cases under somewhat analogous circumstances, see: Zumault v. Wabash R. Co., Mo., 302 S.W.2d 861; Van Buskirk v. Missouri-Kansas-Texas R. Co., Mo., 349 S.W.2d 68; Hackett v. Wabash R. Co., Mo., 271 S.W.2d 573.

Also applicable is the case of State ex rel. Thompson v. Shain, 351 Mo. 530, 173 S.W.2d 406, where, at loc. cit. 408-409, the Court said: "Therefore, instead of having the plaintiff's evidence at war with relator's testimony, we see that it is practically the same, except for the plaintiff's own testimony. His testimony does not undertake to state the exact speed of the train or the exact relative location of his truck or of the train. In each instance, according to the opinion of the respondents, he says it was *about* this speed, or *about* this or that location. It was at best a mere guess or estimate." In referring to some of these cases by way of distinction, counsel say that the principle is only applicable where there is other more favorable evidence upon which plaintiff can rely, and that here there is none, because, the other evidence puts the sight distance even farther east. On this principle they cite: Talley v. Bowen Construction Co., Mo., 340 S.W.2d 701; Roux v. Pettus, Mo.App., 293 S.W.2d 144, and Brooks v. Stewart, Mo., 335 S.W.2d 104, 81 A.L.R.2d 508. Talley has nothing to do with estimates of any kind. In Roux, the view involved was a totally unobstructed city block of 320 feet. In Brooks, the distance involved (567 feet) seems to have been uncontested. But even recognizing that principle, we do find other evidence here from which an inference might fairly have been drawn that the train could not be seen as far away as 200 feet east from the given point. The fireman testified that, although he was watching carefully, *he did not see the car* until the train was 150 feet from the crossing. We may reasonably assume that when plaintiff could see the train the fireman could have seen the car, since his seat was very high in the cab. While the car was not shown to have been 100 feet south of the crossing at that time, the engineer testified that the view down the road was clear. It may also be inferred from a portion of the testimony of the engineer that the cut or embankment began just beyond the point to which the train was backed up, or about 150 feet east of the crossing (fixed by one witness at 120-150

feet), and that the view was blocked until the train reached that point. All of the photographs are also to be considered. These show substantial quantities of weeds and brush on the right-of-way, apparently at a lesser distance than 200 feet, and also along the fence line of the road; and also, that the road is at a lower elevation south of the crossing. The consideration of such other evidence is not so contrary to plaintiff's theory as to be "at war" with it. We may also consider Moore's testimony (not objected to) that the failure to sound an earlier whistle was the cause of the accident, because he would have slowed down more had he heard one. We conclude that, on all the evidence, the question of what was *plainly visible* to the plaintiff from any particular point in the road was a question for the jury, and that the evidence was entirely too ambiguous to require a directed verdict or to convict plaintiff of contributory negligence as a matter of law. Certainly, reasonable men could have differed with regard to the inferences to be drawn.

▮▮▮ As aptly stated by the Springfield Court of Appeals in Henrickson v. Resnik, Mo.App., 390 S.W.2d 610, at loc. cit. 616: "What constitutes negligence in failing to keep a lookout in a particular direction at a particular time or place, and whether a driver who has looked has seen all that he should, is usually a fact question, Slaughter v. Myers, supra, Mo., 335 S.W.2d at 50, 54 [6]; 61 C.J.S. Motor Vehicles § 526, pp. 437–438, and we have the view in this case that the evidence simply presented a question for the jury on the issue of defendant's contributory negligence." And see, generally, as denying contentions of contributory negligence as a matter of law: Zumault v. Wabash R. Co., Mo., 302 S.W.2d 861; Ledkins v. Missouri-Kansas-Texas R. Co., Mo., 316 S.W.2d 564; Van Buskirk v. Missouri-Kansas-Texas R. Co., Mo., 349 S.W.2d 68; Younkman v. Missouri Pacific R. Co., Mo., 304 S.W.2d 19. The contentions which we have thus considered were advanced as eliminating the element of proximate cause in any submission of de-

fendant's negligence and also as establishing plaintiff's contributory negligence as a matter of law. When we rule one we rule the other. We shall rule upon the three separate submissions of negligence in considering Instruction No. 3, but we now hold: (1) that there was substantial evidence of defendant's negligence in *failing adequately to warn,* and that there was also sufficient evidence to warrant the submission of such failure as a proximate cause of the collision. See, generally, Hackett v. Wabash R. Co., supra, Dickerson v. Terminal R. Ass'n, Mo., 284 S.W.2d 568; Van Buskirk v. Missouri-Kansas-Texas R. Co., supra, Zumault v. Wabash R. Co., supra. The duty to warn is to be viewed in the light of all the circumstances, including the extent of public user of the crossing and the obstructions. Hackett, supra, Van Buskirk, supra. From plaintiff's testimony, the jury might well have found negligence in failing to sound a whistle immediately when the fireman admittedly saw the car at 150 feet, or it might have found negligence in not whistling for this partially obscured crossing even before any car was seen. Hackett v. Wabash R. Co., supra. The known circumstances enter into the care required of defendant. There was and is, of course, a very live factual issue of contributory negligence. The cited cases which hold that if one *knows* of the presence of a train, a failure to warn cannot be the proximate cause, Sisk v. Chicago, B. & Q. R. Co., Mo.App., 67 S.W.2d 830, and Amos v. Terminal R. Ass'n of St. Louis, Mo.App., 142 S.W.2d 787, are not apropos here; the opinion in Sisk generally favors the present plaintiff. No one claims that plaintiff *saw* the train earlier than he testified, and on his own evidence he heard no timely whistle or bell. The cases cited by defendant on contributory negligence as a matter of law are distinguishable on their facts. Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, and Pipes v. Missouri Pacific R. Co., Banc, Mo., 338 S.W.2d 30. Each case involved a driver, and in each the Court found that the driver could *plainly see* the train. In our case we do not so find as a matter of law.

Three of defendant's cited cases on contributory negligence merely hold that there was a submissible issue. Thurman v. St. Louis Public Service Co., Mo., 308 S.W.2d 680; Lamfers v. Licklider, Mo., 332 S.W. 2d 882; Hopper v. Conrow, Mo., 347 S.W. 2d 896. Although plaintiff "undertook" to look, it is our opinion that this act did not transpose the full duty of the driver to him, although in looking he was required to look with ordinary care. The trial court improperly entered judgment for the defendant.

▪▪▪ We now consider the ruling on defendant's motion for a new trial. This was sustained on the grounds: (1) that the evidence with regard to the obscuring of vision did not establish either negligence or proximate cause; (2) that there was not sufficient evidence to show that any failure to warn was a proximate cause; and (3), that plaintiff's testimony that he could see for 200 feet, as already discussed at length, eliminated the element of proximate cause both as to lookout and warning. The Court thus held that proximate cause was not established as to any of the three elements; it apparently ruled that the evidence was insufficient to show negligence only as to the obscuring of vision. What we have already said concerning the submissibility of the case is determinative of all contentions on the subject of warning, both as to negligence and proximate cause. That element was properly submitted. Defendant's argument concerning lookout seems to assume that the fireman *saw* the car as soon as possible (on which even he was uncertain) and that nothing more was required because there was then no present indication of danger and the crossing whistle had been sounded continuously. All this completely overlooks plaintiff's testimony that there was *no whistle* until the train was 15-20 feet from the crossing and Moore's testimony of approximately 100 feet. Considering that, some earlier warning could certainly have been given, and *might* have been given had the car been seen sooner. There is, of course, a primary

duty on the defendant to keep a lookout when a train is approaching a public crossing. Cunningham v. Thompson, Mo., 277 S.W.2d 602, and the various other cases we have cited. The necessity of a lookout was heightened here by the very nature of the crossing and its user. On the facts in this case, however, any failure to see the car sooner could only have been beneficial to the plaintiff by virtue of an earlier warning. There was no possibility of stopping or swerving and it is also obvious from the evidence that there could not have been a sufficient slowing to do any good, for the car was stopped overlapping the south rail. (It took the train a full twenty-one car lengths to stop in "emergency.") Under these circumstances the lookout submission was essentially a part of the warning submission, and it added nothing material to the latter; the separate submission of lookout tended to be misleading. There was a positive duty to warn at this crossing, lookout or no lookout. We believe that there was submissible evidence from which a jury could find that the fireman could have seen the car earlier, but as we view the case that does not justify here an independent submission of lookout. By no means do we mean to say that lookout is never independently submissible, even in railroad cases. For cases of other types, see the excellent discussion in Graham v. Connor, Mo.App., 412 S.W.2d 193. We mention in passing that in Hackett, supra, where it was shown that the fireman was doing something else when he should have been looking, the case was submitted only on failure to warn, although the failure to keep a lookout was regarded as a "circumstance."

▪▪▪ We have also concluded that the evidence concerning the extent and location of the weeds and brush was too vague to justify a submission that the vision was thus obscured. That was also a "circumstance" for consideration on the timeliness of any warning. The Van Buskirk case, supra, which was submitted in part upon the obscuring of vision, was based upon

**914**

much more definite evidence. Upon a retrial of this case, if the evidence is substantially the same as that in the present record, it should be submitted only upon the failure of an adequate and timely warning.

The judgment entered for the defendant pursuant to its motion for a directed verdict is reversed; the order sustaining in the alternative defendant's motion for a new trial is affirmed. The cause is remanded for a new trial in accordance with the views expressed in this opinion.

All of the Judges concur.