Goldie KOEHLER et al., Respondent
(Plaintiffs),

v.

BURLINGTON NORTHERN, INC.,
Appellant (Defendant).

No. 38259.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Jan. 24, 1978.

Motion for Rehearing and/or Transfer
Denied March 10, 1978.

Application to Transfer Denied June
20, 1978.

Lucas & Murphy, Joseph A. Murphy, St. Louis, for appellant (defendant).

Charles E. Gray, Gray & Ritter, St. Louis, for respondents (plaintiffs).

GUNN, Judge.

This appeal arises from a suit by plaintiffs, Goldie and Curtis Koehler, against defendant, Burlington Northern, Inc., for injuries sustained as a result of a collision between plaintiffs' van and defendant's freight train. The jury verdict was for plaintiffs in the amount of $605,000. On appeal defendant contends that plaintiffs' verdict directing instructions were erroneous in several respects. It further contends that the jury's largess in its award of damages was so grossly excessive as to indicate its verdict was the product of bias and prejudice. Defendant argues that the amount was unjustified under the evidence in light of awards in other cases involving similar injuries and that a remittitur is required.

We affirm.

The collision occurred in Lincoln County, north of Elsberry, as plaintiffs were re-

turning from a July 4 family outing in Clarksville in celebration of a relative's return from military service. Plaintiff Curtis Koehler was driving the van and was proceeding south on Highway 79 to its intersection with Highway P. At the intersection, Mr. Koehler came to a complete stop, then turned left onto Highway P and at a speed of 8–15 m.p.h. drove toward defendant's railroad crossing which was 75–100 feet east of Highway P. As he approached the crossing, Mr. Koehler decreased his speed until he came to a momentary stop within five feet of the tracks. He described his stop as a "rolling St. Louis stop." Both he and his stepson, Ed Forrester, who was riding next to him in the front passenger's seat, looked up and down the track to see if a train was coming. Neither saw nor heard the approaching train. After his momentary stop, Mr. Koehler continued across the tracks. The van was almost completely across when Mr. Koehler first heard the oncoming locomotive. He turned to look just as the train crashed into the van 6–8 inches from the rear on the passenger side. The van was spun clockwise 270 degrees and dragged 15–20 feet up the track. Goldie Koehler, who was riding in the second to last seat, was thrown from the van and landed unconscious near a railroad crossbuck sign. Apparently no one other than Mrs. Koehler was seriously injured, though at least one of the Koehlers' children was also thrown from the van.

At the time of the collision, the van's windows were closed and the air conditioner was on. Mr. Koehler testified that he had previously driven the van under similar conditions and had been able to hear train bells and whistles when sounded. Both Mr. Koehler and his stepson Ed testified that the train had failed to sound any warning signal prior to its approach. Two other eyewitnesses testified that they did not recall hearing any warning signal by the train, but both admitted on cross examination that they could not state positively that none was sounded. Mrs. Koehler had no recollection of the events surrounding the collision.

Witnesses for the railroad testified that the train approached the Highway P crossing at a speed of 25 miles per hour. Approximately 200 feet from the crossing, the train's brakeman first noticed plaintiffs' van moving towards the crossing. Nothing appeared unusual to the brakeman as the van slowed its approach and came to a stop near the crossing. When the train had approached to within 50 to 75 feet of the crossing, the brakeman saw the van accelerate and realized it was attempting to cross the tracks ahead of the train. He immediately alerted the engineer who activated the emergency braking system. The train did not come to a stop until its caboose was over 100 feet beyond the crossing. The engineer maintained that he had begun sounding the standard two long, one short, one long, blasts of the locomotive's whistle at the whistling post, 480 feet before the crossing. He stated that he ceased his warning signals only when it became necessary to do so in order to apply the emergency brakes. The brakeman corroborated the engineer's testimony that the train's whistle had been sounded from the whistling post. Whether the train's bell had been sounded, in addition to the whistle, was not known by the engineer.

Koehler's inability to see the approaching train was attributed to the high brush and weeds which were allowed to flourish on the railroad's right-of-way. Both Mr. Koehler and his stepson Ed testified that when stopped at the tracks, they had looked in the direction of the on-coming train but did not see it because of the high weeds. In addition to this testimony, several witnesses testified that the weeds and brush were 6–8 feet tall at the time and that they were allowed to grow so close to the track that drivers attempting to cross had to pull almost onto the tracks to see if a train was coming. Defendant's witnesses testified that on the day of the accident the weeds were no more than 3 feet high. Witnesses for both parties agreed that shortly after the accident the weeds and brush were cut.

The Highway P crossing was marked by crossbucks to indicate the presence of a

railroad crossing. No mechanical warning device or crossing gate had been installed even though evidence showed that Highway P was heavily travelled throughout the summer months by persons seeking access to Mississippi River recreational areas.

Immediately after the collision, an ambulance was summoned for Mrs. Koehler who was unconscious. She was first taken to a local hospital but because of the seriousness of her injuries was transported to St. Joseph's Hospital in Kirkwood. When she arrived she was in extremely critical condition and remained so for several days. We will detail Mrs. Koehler's injuries in our discussion of the points raised concerning the alleged excessiveness of the verdict. It is sufficient here to say that she produced evidence of severe injuries to many of her limbs and internal organs, resulting in permanent scarring, disfunction and disability.

At the conclusion of the evidence the jury returned verdicts in favor of the plaintiffs. They awarded Mr. Koehler $4,000 damages for injuries to his wife and $1,000 for damages to his property. Mrs. Koehler was awarded $600,000 in damages resulting from her injuries. The railroad appeals both awards.

Defendant first argues that plaintiffs' verdict directing instructions were defective in that they did not submit plaintiffs' theory of negligence as pleaded; that they erroneously stated the law regarding defendant's duty to warn the public of its approach to a crossing; and that they failed to submit the ultimate issue of fact. The instruction complained of was submitted as follows:

"Your verdict must be for plaintiff Goldie Koehler if you believe:

First, defendant failed to give an adequate and timely warning, and

Second, defendant was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff Goldie Koehler.

The term 'negligence' as used in this instruction means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances." [1]

Defendant's first attack on the verdict directing instructions is that plaintiffs did not plead the inadequacy or the untimeliness of the warning given but only that no warning was given at all.[2] Plaintiffs rely on the following allegation contained in their petition as the basis for the instruction given.

"3. The aforesaid collision and the resulting injuries and damages sustained by plaintiff were directly and proximately caused by the negligence of defendant in the following respects, to-wit: . .

c) It failed, through its employees and the negligence of its employees, to sound a warning of the approach of said train to said crossing as required by the laws of the State of Missouri."

---

1. The verdict directing instruction relating to Curtis Koehler was in all relevant respects identical to that relating to Goldie Koehler.

2. Defendant also argues that plaintiffs' counsel in his closing argument abandoned his allegation of failure to sound a warning in the following colloquy:

"Now, ladies and gentlemen, the Court has given you the instructions that are to guide you. It submits to you this issue—was timely and adequate warning given? Now, what does that mean? You take into consideration, these facts, ladies and gentlemen, to make that determination. Was the brush there? Take into consideration the amount of traffic and then tell the railroad what do you do when you come into that crossing. You don't give two longs, a short and a long—you give it so people will know it." This statement by counsel read out of context might support defendant's allegation of abandonment. Read in context, however, it is clear that plaintiffs' counsel is only assuming for the sake of argument that defendant gave the statutory warning. He argues that even assuming that fact, defendant would still be negligent, because the statutory warning was inadequate under the circumstances. Cf. De Armon v. City of St. Louis, 525 S.W.2d 795 (Mo.App. 1975).

Instructions must be within the general scope of the pleadings. *Price v. Seidler*, 408 S.W.2d 815 (Mo.1966). An instruction which is broader than the pleadings i. e., one that allows the jury to find for plaintiffs on a basis different than that pleaded and proved, is erroneous. *Faught v. St. Louis-San Francisco Ry. Co.*, 325 S.W.2d 776 (Mo.1959); *Benham v. McCoy*, 213 S.W.2d 914 (Mo.1948). Here, plaintiffs' pleadings contained an allegation that the defendant was negligent in failing to sound a warning as required by the laws of this state. Such an allegation is broad enough to encompass the common law and decisional law in addition to the statutory law. Thus, if the law under any of these sources requires defendant to give adequate and timely warning, the instruction given is within the scope of the pleadings.

Holding as we do on the breadth of plaintiffs' pleadings, we reach defendant's second point regarding the verdict directing instructions. We indite the law of this state governing a railroad's duty to signal its approach at a public crossing and examine the instructions to determine if they embody the law. By statute a railroad is required to ring its bell or sound its whistle from a point no less than 80 rods from the crossing. Failure to sound one or the other of the prescribed signals results in liability by the railroad for all damages proximately caused by its omission. § 389.-990, RSMo.1969. This statutory warning is not coextensive with the railroad's duty to warn of its approach under the common law as interpreted by the courts of this state. *Doolin v. Swain*, 524 S.W.2d 877 (Mo. banc 1975); *Sisk v. Chicago, B. & O. Ry. Co.*, 67 S.W.2d 830 (Mo.App.1934). Under the common law, the railroad has a duty when nearing a crossing to exercise ordinary care to avoid injury to persons and property by warnings or otherwise. Whenever danger to persons or property may be reasonably anticipated, it must signal the approach of its trains so as to alert those in a position of potential peril of its impending presence.

*Hackett v. Wabash R.R. Co.*, 271 S.W.2d 573, 577–578 (Mo.1954).

"The means of the warning should be commensurate with the danger to be encountered by the highway traveler in the circumstances and should be timely. Generally the means employed for the warning of a train's approach is the sounding of a whistle or the ringing of a bell. Our statute (§ 389.990, supra), requiring a warning or the ringing of a bell, did not do away with the common-law [sic] duty of a railroad to signal the approach of its trains. The statute is but cumulative of the common law, and the statute only provides the minimum requirements of the means and the timeliness of warnings at highway crossings. The questions of negligence at common law in failing to take the precaution of giving a warning, and of the *timeliness and adequacy of a warning* given are generally jury questions." (emphasis added)

Thus, the railroad has the common law duty to give such warnings in excess of those required by statute as are warranted in the exercise of ordinary care under the circumstances. *Williams v. Thompson*, 166 S.W.2d 785 (Mo.App.1942). Each case must be decided on its own facts to determine what, if any, additional warnings must be given to avoid negligence. Where the particular crossing is more hazardous than ordinary because it is heavily travelled or its terrain is such that motorists' line of sight down the track is obstructed, it is a jury question whether the railroad has met its duty of due care to give adequate warning of the approach of its trains. *Grothe v. St. Louis-San Francisco Ry. Co.*, 460 S.W.2d 711 (Mo. 1970); *Hackett v. Wabash R.R. Co.*, supra; *Sisk v. Chicago, B. & O. Ry. Co.*, supra. Certainly, the extent and location of any weeds or brush which block the highway traveller's view of the train are circumstances to be considered on the question on the sufficiency of the warning. *Baldwin v. Atchison, Topeka & Santa Fe Ry. Co.*, 425 S.W.2d 905 (Mo.1968).

It is clear from the foregoing that plaintiffs' verdict directing instructions correctly submitted for the jury's consideration whether defendant had met its common law duty to give a timely and adequate warning such as an ordinarily careful and prudent person would give under similar circumstances. Plaintiffs produced competent evidence that no whistle or bell was sounded as the train approached the Highway P crossing.[3] If the jury believed this testimony, defendant breached even its statutory duty. Moreover, there was substantial evidence by disinterested witnesses that this was an extrahazardous crossing necessitating warnings in addition to those required by statute. Resorts and fishing lakes along Highway P attracted many persons making traffic at the crossing very heavy in the summer when this collision occurred. In addition, there was evidence, again from disinterested witnesses, that weeds and brush were allowed to grow so high and so close to the tracks that motorists were required to pull up almost onto the tracks before they could see an oncoming train.[4] Under these facts there was a jury question whether defendant's warning (if any was given) was adequate and timely so as to warn plaintiffs of the approaching train.

Defendant's argument that the verdict directing instructions misstated the law in that they failed to further define "adequate and timely warning" is without merit. It is true that terms of art included in instructions must be defined to be fully understood by a jury. The meaning of non-technical, readily understandable phrases, however, need not be explicated. To require otherwise would envelop juries in a morass of philological subtleties and would impede the truth finding process. This court in *Kinder v. Pursley,* 488 S.W.2d 937 (Mo.App.1972), held specifically that ade-quate and timely warning is a phrase which defines itself and is thus readily comprehensible by a jury. No further definition is necessary when the meaning of the words used are clear from the context of the case. See *White v. Rohrer,* 267 S.W.2d 31 (Mo. 1954); see also MAI 17.01; MAI 17.05. Plaintiffs' verdict directing instructions correctly submitted defendant's duty to warn under the laws of this state.

Defendant's final challenge to the verdict directing instructions is that they submitted unnecessary evidentiary detail but failed to submit the ultimate issue to the jury. As defendant correctly states, the goal of MAI is to leave evidentiary detail to the argument of counsel and to submit only the ultimate issues for the jury's resolution by means of simple and concise instructions. Rule 70.01 VAMR; *Stemme v. Siedhoff,* 427 S.W.2d 461 (Mo.1968); *Glastris v. Union Electric Co.,* 542 S.W.2d 65 (Mo.App.1976). But defendant's conclusion that these instructions are in violation of MAI's mandates is in error. Even a cursory examination of the contested instructions reflects that there is a complete absence of unnecessary evidentiary detail. We have previously stated that these instructions properly placed the ultimate issue of defendant's negligence before the jury. The verdict directing instructions do not suffer from the infirmities defendant has suggested.

Defendant's remaining points relied on relate to the alleged excessiveness of the jury's verdict. Two separate attacks have been made. First, defendant argues that the verdict is so grossly excessive as to indicate that the entire outcome of the case was the product of bias and prejudice engendered against defendant. In the alternative, defendant argues that the verdict is merely excessive in amount under the evidence.

---

3. Of course, defendant introduced a substantial quantum of testimony that bells and whistles were ringing and blowing as the train approached the crossing, but conflicts in testimony are for jury resolution.

4. Again, the defendant presented evidence in conflict with plaintiffs' on this point.

Defendant's first allegation of error, if sustained, can only be cured by granting a new trial. If a verdict is in fact the product of bias and prejudice, the jury is guilty of impropriety. Because of its prejudice against one party, it ignores the proof and exhibits its bias by the munificence of its verdict for the other party. Such misconduct vitiates the entire verdict. *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977); *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417 (Mo. banc 1973); *Skadal v. Brown*, 351 S.W.2d 684 (Mo.1961); *Woodford v. Illinois Central Gulf R.R. Co.*, 518 S.W.2d 712 (Mo.App.1974). The mere excessiveness of the verdict, standing alone, does not establish that it was the result of bias or prejudice. Defendant must show that the verdict was glaringly unwarranted by the evidence. In addition defendant has the burden of showing some trial error or misconduct by the prevailing party responsible for prejudicing the jury against defendant. *Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102 (Mo.1973); *Huffman v. Young*, 478 S.W.2d 332 (Mo.1972); *Sanders v. H & S Motor Freight, Inc.*, 526 S.W.2d 332 (Mo.App.1975). Here, the only error defendant points to is that which concerns the impropriety of the verdict directing instructions. We have already ruled against defendant on that alleged error. As it has suggested no other trial error which could have engendered the requisite prejudice, we must rule against defendant on this point as well.

Defendant's second attack on the amount of the verdict is simply that it is too bounteous under the evidence. Where the jury errs by awarding a verdict which is merely excessive, injustice may be prevented by ordering a remittitur. A new trial is not required, because the jury is guilty of no misconduct. It simply has made an honest mistake in weighing the evidence as to the nature and extent of the injury and in awarding damages disproportionate to amounts commonly awarded in cases involving similar injuries. *Blevins v. Cushman Motors*, supra; *Worley v. Tucker Nevils, Inc.*, supra; *Skadal v. Brown*, supra.

The purpose of the doctrine of remittitur is to prevent awards from exceeding the upper limits of fair and reasonable compensation. *Worley v. Tucker Nevils, Inc.*, supra. There is, however, no precise mathematical formula by which the jury, the trial court or this court may arrive at the proper award. No two cases are identical. Each must be decided on its own peculiar facts. *Hart v. City of Butler*, 393 S.W.2d 568 (Mo.1965); *Lawson v. Cooper*, 475 S.W.2d 442 (Mo.App.1972). Whatever the exact amount it should be sufficient to provide for the care and comfort of the injured plaintiff and should ameliorate her suffering. *Sanders v. H & S Motor Freight, Inc.*, supra.

We are not without guidance in determining the appropriate award in a given case. We look to such factors as the plaintiff's age, the nature and extent of the injuries and losses, the diminished working and earnings capacity, the changing economic factors, i. e., spiraling inflation, the permanency and degree of injury or disability, the amount of pain and suffering, the plaintiff's educational level and the awards in cases involving similar injuries under the rule of uniformity. *McDowell v. Southwestern Bell Tel. Co.*, 546 S.W.2d 160 (Mo. App.1976); *Ricketts v. Kansas City Stock Yards*, 537 S.W.2d 613 (Mo.App.1976); *Woodford v. Illinois Central Gulf R.R. Co.*, supra.

In looking at these factors to determine if the verdict is excessive, we do not weigh the conflicting evidence. That is the function of the jury in reaching its verdict and of the trial court in ruling on the motion for remittitur. On appeal we view the evidence in the light most favorable to the verdict disregarding all unfavorable evidence to the contrary. *Huffman v. Young*, supra; *Woodford v. Illinois Central Gulf R.R. Co.*, supra. If there is substantial

evidence to support the verdict, it will be affirmed. *Morris v. Israel Bros., Inc.,* 510 S.W.2d 437 (Mo.1974). We will not order a reduction of the verdict unless as a matter of law it is excessive. It must be so grossly excessive that it shocks the conscience of this court and convinces us that both the jury and the trial court abused their discretion. *Cline v. Carthage Crushed Limestone Co.,* supra; *Ricketts v. Kansas City Stock Yards,* supra. We will exercise our power to interfere with their judgment with caution and only where the verdict is manifestly unjust. *Hart v. City of Butler,* supra; *McDowell v. Southwestern Bell Tel. Co.,* supra. We recognize that the assessment of damages is primarily the function of the jury. *Blevins v. Cushman Motors,* supra; *Blond v. Overesch,* 527 S.W.2d 663 (Mo.App. 1975). They are in a far better position than we to appraise the plaintiff's injuries and award a sum which will reasonably and fairly compensate her.

We have reviewed plaintiff's injuries in light of the foregoing considerations and have concluded that the jury's award was not so excessive as to require a remittitur.

■ Mrs. Koehler received serious and permanent injuries as a result of the collision with defendant's train. When she arrived at St. Joseph's Hospital for treatment, she was on the verge of death. She was severely battered externally with multiple lacerations, abrasions and contusions. Several bones were visibly fractured. She was in profound shock. As one of the treating physicians stated, "in general she was just a mass of bruises and abrasions." She was taken to surgery where an exploratory laparotomy was performed. This operation, which is performed to learn the extent of internal injuries, requires an incision from the breast bone (xiphoid) to a point below the navel (pubic bone). Once inside, the team of surgeons found that Mrs. Koehler's spleen and bladder were ruptured and that she was bleeding from several other organs. The spleen was removed, the bladder was sutured and the hemorrhaging was treated.

After surgery, Mrs. Koehler was taken to the intensive care unit where she remained in critical condition for over a week. She remained hospitalized for 56 days.

Of the numerous fractured bones the most serious was the injury to Mrs. Koehler's pelvis. The six bones of her pelvis were crushed. Both bones in her left forearm were fractured with the bones overriding one another. The extensor tendon controlling her right thumb was severed and three to five ribs were fractured. Under normal conditions these fractures, with the exception of those to the pelvis, could have been treated immediately with excellent potential for full recovery. Because of the severity of the internal injuries, however, neither the fractures nor the severed tendon could be repaired at the time of Mrs. Koehler's admission. As a result she suffered permanent impairment of function.

As a result of the injury to her left arm and right thumb, Mrs. Koehler's use of both arms has been impaired. She testified that she could lift nothing heavier than a cup of coffee with her left hand and was hampered in grasping anything with her right hand. The pelvic injury left her left leg shorter than her right. This shortening caused a permanent limp and required that she walk with a cane. It also produced constant lower back pain which even the physician who examined Mrs. Koehler for the railroad admitted would be permanent. Because the pain intensifies whenever she is ambulatory, Mrs. Koehler spends most of her time in bed. She continues to take prescription painkillers every four hours to relieve her discomfort.

At the time of the accident Mrs. Koehler was 45 years old. She had been employed steadily since 1966 as a factory worker doing physical labor. Her final rate of pay was $9,600 per year. Since the accident she has been unable to do hard physical labor and has not returned to any employment. She is limited in the household functions she can perform. In addition to her regular employment, Mrs. Koehler had been a

mother to her family doing the cooking and housework in addition to sewing all of her own clothes and most of her children's. She was active in her church and various recreational activities with her family and friends. Now she can do only very limited housework because of the impaired functioning of her hands and arms and because of the constant pain. She no longer enjoys any activities outside of her home. Her sexual relationship with her husband has been severely curtailed, if not eliminated.

In monetary terms Mrs. Koehler has lost past as well as future earnings as a direct result of her injuries. Doctor and hospital bills have exceeded $11,000. In addition to these monetary damages, she has suffered physical injuries and resulting limitations. She is permanently disabled. She remains in constant pain and is often bedridden. Her left arm is deformed and she now walks with a limp. She has numerous external scars including one from just below her bustline to below her navel. There is also the potential for future complications from her internal injuries and the scar tissue they created. These include continued pain and bowel problems from adhesions in the abdominal cavity as well as hypertension from the kidney and bladder injuries.

Under the circumstances of this case, and giving effect to all relevant factors, including review of awards in other cases, we cannot say that the jury award was excessive or that the trial court abused its discretion in failing to order a remittitur. *Bedwell v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 509 S.W.2d 81 (Mo.1941); *McDowell v. Southwestern Bell Tel. Co.*, supra.

The judgment is affirmed.

WEIER and KELLY, JJ., concur.