Sheila SMITH, a minor, By and Through Mary SMITH, her mother, natural guardian and next friend, Plaintiff-Respondent,

v.

ARCHBISHOP OF ST. LOUIS, on Behalf of the ARCHDIOCESE OF ST. LOUIS, Defendant-Appellant.

No. 42704.

Missouri Court of Appeals, Eastern District, Division Two.

March 16, 1982.

Motion for Rehearing and/or Transfer Denied April 16, 1982.

**518**

John J. Horgan, St. Louis, for defendant-appellant.

Edw. P. McSweeney, St. Louis, for plaintiff-respondent.

PER CURIAM.

This is an appeal by the Archdiocese of St. Louis from a jury verdict of $1,250,000 in favor of plaintiff, Sheila Smith, in her suit alleging negligent supervision.[1] Sheila's mother brought the action as Sheila's guardian and next friend.

In May 1976, Sheila was an eight-year-old second grade student at defendant's Good Shepherd School. Sheila was to play the part of a bluebird in a school play planned for May 18. Sheila's teacher, Ms. Mary Jane Wiegand, left to Sheila's mother the styling and material of the costume; Ms. Wiegand instructed only that it should be blue and have "feathers". Sheila's mother obtained a dove costume from a neighbor and transformed it into a bluebird costume by attaching pieces of crepepaper and tissue to simulate feathers.

Because the month of May was dedicated to the Mother of Jesus, Ms. Wiegand had lighted a candle on her desk every school day since May 1. The candle was approximately eight and one-half inches tall and three inches in diameter. The candle remained lighted from prayer time earlier in the morning until recess at about 10:15 a. m. Although Ms. Wiegand was aware that children and lighted candles pose danger, she did not give the children any special instructions regarding the lighted candle. She stated that the children knew the candle was on the desk and that they were not to wander near it. Defendant had no guidelines or policy with regard to burning candles in the classroom. The school principal acknowledged that second grade children, aged seven and eight, do not pay much attention to their own safety; they have short attention spans, and must repeatedly hear instructions as to their personal safety. Sheila's mother was unaware of the custom of lighting the candle in the classroom.

On the morning of May 18, the day of the play, Ms. Wiegand lighted the candle. It remained burning as the children changed into their costumes. Ms. Wiegand was helping some of the children with their costumes in the rear of the classroom while other children, already costumed, milled around the room. Suddenly one of the children screamed, "Sheila's on fire." Ms. Wiegand turned to see Sheila standing near the desk, her head and shoulders on fire. Ms.

[1] Plaintiff also named Cleo Wrap Corp. and Fox Valley Corp. as defendants, but the court sustained their motions for directed verdict at the close of plaintiff's case.

Wiegand attempted to put out the flames by rolling Sheila on the floor. Unsuccessful, she next lay on Sheila and beat the flames with her hands. When this method also failed, Ms. Wiegand finally doused the flames with water from a flower vase. The teacher and principal removed Sheila's clothing and wrapped her in cold, wet towels. After Sheila's mother arrived, an ambulance took Sheila to Christian Hospital, which immediately transferred her to St. John's Mercy Hospital's burn unit.

Sheila sustained burns over 22.45% of her body. The most severe burns were located on her neck, left ear, arms, hands, and on the front of her upper thighs.

Linda Book, head nurse at St. John's burn unit, testified about Sheila's treatment during her twenty-six days hospitalization. Burn unit personnel first treated Sheila for shock. They then cleaned the burned areas with sterile gauze and saline solution. They removed the tops of the blisters to allow the medication to reach the damaged skin and applied dressings. The burned portions of Sheila's body were elevated to help decrease swelling; splints were applied to her arms and hands to prevent "drawing" or "pulling" of the skin surrounding the burned areas. The burn wounds required daily dressing changes. During these sessions, dead skin as well as the tops of blisters were removed and the damaged tissues examined to determine if further abscesses had developed under the skin.

Nurse Book testified that although Sheila received a pain pill prior to these dressing changes, the procedure was still extremely painful to her and she often cried and resisted efforts to dress the wounds. During the early days of her prolonged hospital stay, Sheila experienced high fevers, swelling, sleepless nights, homesickness, and nightmares. She was frequently unable to control her bladder at night. As the wounds began to heal, Sheila experienced severe itching caused by the thick areas of burned tissue separating from her body. Nurse Book described the itching as a "trickling" sensation; "[t]he skin feels like it's crawling or . . . has . . . little needles

sticking in it." This thick leather-like skin (eschar) was removed using forceps and scissors. Again, although she received pain medication, Sheila resisted the procedure. Nurse Book stated that the wounds became very vascular and bled easily when dressings were removed.

When the burn wounds healed sufficiently, Sheila began physical therapy. Therapy was so painful for Sheila that her mother's visits were offered as a reward for her cooperation during treatment.

At St. John's Hospital on June 3, Sheila underwent skin graft surgery, a very painful procedure. The surgeon removed dead tissue from the burn sites and applied new skin from Sheila's hip and the back of her thigh to her shoulders, arms, and thighs. This procedure effectively doubled the wounded area since the donor sites were then as painful as the burn sites. The donor site, with its exposed nerve endings, is the equivalent of a new burn. It, too, leaves scars.

During her recovery from anesthesia, Sheila behaved frantically. When an intravenous needle in her neck was dislodged, Sheila's hysterical fear of the needle convinced attending personnel not to reinsert it. Her tossing wrinkled some of the grafts under the dressings and caused others to become "soupy". New grafts were applied to these areas. Nurse Book stated that this procedure was at least as painful as the normal dressing change.

Sheila spent twenty-six days in St. John's Hospital. Throughout her stay she suffered severe pain, fear of procedures necessary for her treatment, horror at her own appearance, and apprehension that she would be ostracized. Her inability to cope with these emotions during this time was evidenced by frequent incontinence, screaming, crying, physical violence, and continual pleas for her mother. Nurse Book testified "the most striking thing . . . [she could] remember about [Sheila] was this psychological problem that continued to be with her all the way up till she was discharged . . . ."

After Sheila's discharge from the hospital, her mother assumed the care and treatment of her wounds. Sheila soaked in warm water for an hour and a half each day so that her mother could loosen certain areas of the skin, pull them back, and trim them with scissors to prevent infection. Sheila also exercised several times daily to prevent pulling or shrinkage of the skin over the burn sites. These painful procedures continued until July, when Sheila's doctor observed that the skin grafts were beginning to rise and form very thick scar tissue, called keloid. He then prescribed Jobst stockings to deter keloid formation. Jobst stockings are snugly fitting garments designed to exert extreme pressure on the scarring area to prevent the scars from rising. Sheila was required to wear the garments over her arms, shoulders, and hands twenty-four hours every day. These anti-scar garments were uncomfortable and caused Sheila much embarrassment.

Unfortunately, the garments were not as effective as the doctor had hoped. Thus, in January 1977 Sheila's mother consulted Dr. Francis Paletta, a plastic surgeon, regarding the keloid problem. Dr. Paletta recommended regrafting of the burned areas, a procedure which he began in four separate operations between April 1977 and April 1978. Each operation required Sheila to be hospitalized for seven to ten days. After surgery, Sheila again wore the Jobst garments and kept the regrafted areas lubricated. Although this surgery smoothed the scar tissue, the scars are still quite obvious and will always be so. Furthermore, as Sheila grows older the scar tissue will dry and age much more rapidly than the undamaged skin.

At the time of the trial Dr. Paletta had grafted the scarred areas on Sheila's neck and jaw, left forearm, left hand, and right arm. Keloid formations remained on her thighs, arms, chest, and one ear. Dr. Paletta expected to see Sheila intermittently in the future for regrafting of some of the remaining scars. He stated, however, that Sheila's scars are permanent.

Sheila's mother, Ms. Smith, testified that after the accident, Sheila was the object of much curiosity and attention. For example, people would ask Sheila whether she was the little girl with scars. Before Dr. Paletta regrafted the keloid formation on Sheila's neck, one person commented that the scar looked like "fifty wads of chewing gum". Ms. Smith further testified that prior to the accident, Sheila was in every way a normal, inquisitive, friendly eight-year-old child. Ms. Smith stated that she was proud of the way Sheila had coped with the physical and psychological trauma generally, but that there were distinct changes in her personality. Sheila could no longer stand to be alone. She constantly groomed and primped in an attempt to hide her scars. She was extremely nervous, often speaking so rapidly that her mother could not understand her. She lacked self-confidence and expressed fears about her future.

Dr. Bernstein, a professor of psychiatry, examined Sheila and also testified about her emotional state. Dr. Bernstein stated Sheila was clearly more anxious, active, and troubled than a normal child. Sheila's extreme anxiety about her exposure to others was manifested by perspiration, hand tremors, wide eyes, and almost constant motion. She tried to cover her deformed ear and habitually turned her scarred left jaw away from people. She has been called many cruel names: "burned out", "scar face", "scarred", "scabby", and "scarfy". People stared at her on the street and asked what had happened to her. She was troubled by remarks when she went swimming and by stares even when she was fully dressed. If she wore summer clothing or undressed in the gym, she had to deal with the curiosity of observers, many of whom found her scars repulsive. Other children teased her but did not want to touch her. Sheila was accordingly troubled about how to get along with people who focused on her as a thing rather than as a person. Because she was continuously concerned with what people would say when they saw her, she was less able to concentrate on school and daily activities.

Dr. Bernstein testified that Sheila experienced many fears. She felt she was ugly. She had nightmares of being burned and was afraid to go into her cellar. She feared being alone or being in the dark. She was concerned about what will happen to her when she grows up. Sheila was always on her guard for the reactions or verbal attacks of others. In Dr. Bernstein's opinion, Sheila was "still functioning", but her emotional involvement with her family and her concentration on school work suffered because of her preoccupation with her physical appearance.

Pursuant to Dr. Bernstein's request, Sheila underwent psychological testing during five visits with a psychologist, Dr. Larry Kiel. Although Dr. Bernstein felt that Sheila did not need psychiatric counseling at the time of trial, he believed she will require it during adolescence when the need to be physically attractive reaches its peak. Dr. Bernstein stated that Sheila is at risk for many psychological problems. She is more likely to become depressed, to give up at school, and to withdraw from people. She is more likely to experiment with drugs to relieve her anxiety, or with sex to get the attention that she fears her appearance will otherwise deny her. Sheila is more susceptible to "social death," a form of withdrawal wherein relations and contacts with other people are cut off. Dr. Bernstein further stated that Sheila's visible scars will be an employment handicap.

In its first point on appeal, the Archdiocese claims the court should have directed a verdict in its favor because plaintiff failed to make a submissible case on the issue of whether defendant breached its duty to supervise plaintiff. Defendant also claims plaintiff failed to make a submissible case on the issue of whether defendant failed to maintain its premises in a safe condition. The latter claim of error is not relevant to this case since plaintiff neither premised her right to recovery on such a theory nor submitted it to the jury.

■ A submissible case requires that plaintiff present sufficient evidence to reasonably support each element of her cause of action. In determining whether plaintiff has presented sufficient evidence of each element, we review all evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff. *Howard v. Lundry*, 591 S.W.2d 193, 197 (Mo.App.1979). Governed by these principles, we must determine whether plaintiff presented evidence from which the jury could have found that defendant, through its agent Ms. Wiegand, was guilty of negligence in failing to properly supervise plaintiff. *See Kerby v. Elk Grove Union High School Dist.*, 1 Cal. App.2d 246, 36 P.2d 431, 433 (Cal.App.1934).

■ Negligent supervision, like any other tort, involves a breach of a duty defendant owes plaintiff which causes plaintiff to suffer damages. *See Nichols v. Blake*, 418 S.W.2d 188, 191 (Mo.1967). To recover, plaintiff need not show that the very injury resulting from defendant's negligence was foreseeable, but merely that a reasonable person could have foreseen that injuries of the type suffered would be likely to occur under the circumstances. *Ziegler v. Santa Cruz City High School Dist.*, 168 Cal.App.2d 277, 335 P.2d 709, 713 (Cal.App.1959).

Defendant does not question that the flame from the candle ignited plaintiff's costume and caused her severe injuries. Defendant contends, however, there is no evidence the tragedy occurred as a result of any negligence on Ms. Wiegand's part.

We disagree. Our review of the record reveals ample evidence to support the jury's finding that defendant negligently supervised plaintiff.

■ In Missouri the scope of Ms. Wiegand's duty to supervise plaintiff is narrow. The defendant is not an insurer of plaintiff's safety, *Kersey v. Harbin*, 591 S.W.2d 745, 749 (Mo.App.1979), nor is defendant required to maintain a constant vigil over each member of the class by keeping every student within eyesight. *Clark v. Furch*, 567 S.W.2d 457, 458 (Mo.App.1978). The duty of defendant, or in this case Ms. Wiegand, was merely to exercise reasonable or ordinary care in the supervision of plaintiff. *Kersey v. Harbin*, 591 S.W.2d at 749. The

exercise of ordinary care where children are involved, however, requires more vigilance and caution than might the exercise of ordinary care where adults are concerned. *Ballard v. Polly*, 387 F.Supp. 895, 898 (D.D.C. 1975); *Bronson v. Kansas City*, 323 S.W.2d 526, 531 (Mo.App.1959). This is particularly true when a potentially dangerous condition exists and the supervisor is or should be aware of it. *Ballard v. Polly*, 387 F.Supp. at 899; *see Taylor v. Oakland Scavenger Co.*, 17 Cal.2d 594, 110 P.2d 1044, 1048 (Cal. 1941). The final determination of whether a supervisor has competently discharged the duty of ordinary care in the supervision of her charges turns on the facts of each particular case. *See Buzzard v. East Lake School Dist.*, 34 Cal.App.2d 316, 93 P.2d 233, 236 (Cal.App.1939).

■ ₐIn the instant case Ms. Wiegand testified the candle was lighted every school day in May. She recalled giving the children some type of cautionary instruction regarding the candle, but she could not recall precisely what she told them. She did not give any instruction on the morning of Sheila's accident. Ms. Wiegand acknowledged that young children have short attention spans and require frequent repetitions of instructions. The principal also testified that seven- and eight-year-old children pay little attention to their own safety.

On the day of the play Ms. Wiegand told the children to change into their costumes. As she helped some of the children with their costumes, others milled around the classroom. All of the children were excited that morning in anticipation of their performance. Ms. Wiegand admitted that, although "children and candles pose danger," she did nothing in particular on the day of the play to ensure that no child came in contact with the candle.

When Sheila's costume ignited, she was near Ms. Wiegand's desk in the front of the classroom. Ms. Wiegand was helping another student in the rear of the classroom.

The jury could have found on the basis of this evidence that, under the circumstances which she admitted could pose danger, Ms. Wiegand failed to exercise reasonable care in the supervision of the young children under her charge. *See Cioffi v. Board of Education*, 27 App.Div.2d 826, 278 N.Y.S.2d 249, 249 (N.Y.App.1967); *Tardiff v. Shoreline School Dist.*, 68 Wash.2d 164, 411 P.2d 889, 893 (Wash.1966).

Defendant's first point is denied.

Defendant claims in its second point that the trial court erred in giving plaintiff's verdict director because the instruction was not supported by substantial evidence of a breach by defendant of its duty to supervise plaintiff. Our discussion and conclusion regarding defendant's first point disposes of this point. The instruction was supported by substantial evidence.

■ Defendant also claims submission of the instruction was error because it did not require the jury to find that defendant knew or should have known the candle created an unreasonably dangerous condition in the classroom.[2]

Plaintiff counters with the argument that such a finding was not necessary because knowledge or notice of an unreasonably dangerous condition is not an element of negligent supervision. We agree.

Defendant makes no substantive argument to support its conclusion that plaintiff's theory of recovery required her to submit to the jury the issue of notice of an unreasonably dangerous condition. Conced-

---

**2.** Plaintiff's verdict director, M.A.I. 17.02 modified, read as follows:

"Instruction No. 3.
Your verdict must be for plaintiff and against defendant if you believe:
"First, the teacher Mrs. Wiegand either:
    caused or permitted the lighted candle to be on her desk, or
    failed to extinguish or remove the lighted candle, or

failed to supervise plaintiff adequately, and
"Second, the teacher Mrs. Wiegand's conduct, in any one or more of the respects submitted in paragraph First was negligent, and
"Third, as a direct result of such negligence, plaintiff sustained damage."

ing that the form of Instruction 3 might properly submit "failure to supervise," defendant argues it improperly submits a theory of recovery based on defendant's liability as a landowner. Defendant claims that M.A.I. 22.03 is the proper format for submitting the issue of a landowner's negligence in allowing to remain on his property a dangerous condition which results in injury to an invitee.

Defendant's observations on the proper use of M.A.I. 22.03 are correct but irrelevant. As stated in our discussion of defendant's point one, plaintiff neither pleaded nor attempted to prove her right to recovery on the theory of a landowner's duty to an invitee. Rather, plaintiff claimed damages resulting from defendant's negligent failure to exercise ordinary care, under the circumstances, in the supervision of plaintiff. Instruction 3 plus the instruction defining negligence submitted the elements of negligent supervision. All of these elements were supported by the evidence. We rule against defendant on its third point.

Defendant's fourth point complains that during voir dire plaintiff's counsel asked in bad faith whether any prospective jurors were employed by or had a financial interest in three named insurance carriers. The named companies provided liability insurance for the original three defendants.

■ Jurors' possible interest in companies insuring a defendant is an appropriate area of inquiry. *Chrisler v. Holiday Valley, Inc.*, 580 S.W.2d 309, 313 (Mo.App.1979). Counsel must lay the proper foundation, however, before asking the panel to disclose any such interest. *Yust v. Link*, 569 S.W.2d 236, 239 (Mo.App.1978).

■ Prior to voir dire and *in camera*, plaintiff's counsel asked defense counsel whether the named carrier had a financial interest in the outcome of the suit. Defense counsel responded that it did. Plaintiff then requested the court's permission to ask the jurors if any of them were em-

ployed by or had a financial interest in the named insurance company. The court granted permission to ask the question so long as it was interspersed among others and not "highlighted". Plaintiff's counsel asked the question of the jury precisely as the court instructed.

This procedure conforms with the requirements set out in *Yust v. Link*, 569 S.W.2d at 239; *see also Smith v. City of Farmington*, 577 S.W.2d 117, 120 (Mo.App. 1978). Indeed, defendant made no argument that it does not conform. Rather, defendant requests this court to reconsider the foundation requirements. Defendant cites a Kentucky case and an Illinois case for the proposition that a plaintiff should show a reasonable belief of juror interest in defendant's insurer before the court permits plaintiff to ask jurors about any such interest. Defendant presents no persuasive reasons for imposing this additional burden other than the unsupported conclusion that juries award larger verdicts against insured defendants. We decline defendant's invitation to change Missouri law on this procedure, which the Missouri Supreme Court approves and requires us to follow.

■ Defendant next complains that the trial court should have allowed defense counsel to state to the jury during closing argument that they were not to consider plaintiff's medical expenses in reaching their verdict since those damages were the subject of a separate claim by plaintiff's parents.[3] Defendant claims his proposed argument was proper under *O'Brien v. City of St. Louis*, 355 S.W.2d 904, 907–08 (Mo. 1962), in which the Supreme Court affirmed the trial court's allowance of similar argument. In concluding that the argument was permissible, *O'Brien* did not hold that a trial court may not exercise its discretion with regard to such statements. On the contrary, the trial court has wide discretion in controlling the remarks counsel make during final argument. *Beesley v. Howe*, 478 S.W.2d 649, 652–53 (Mo.1972); *Satterfield v. Southern Ry. Co.*, 287 S.W.2d 395, 400 (Mo.App.1956). We find no abuse of

---

**3.** During the jury deliberations, the jury sent the following question to the court: "Can we find out what her total expenses have been up

to date?" The court responded as follows: "You have heard all of the evidence. The Court cannot further instruct you."

that discretion where, as here, the trial court disallowed statements relating to matters not raised in the pleadings, not supported by the evidence, and not submitted to the jury in the form of an instruction. *Cf. Malone v. Small*, 291 S.W. 163, 166 (Mo.App.1927) (no error in excluding opening statement regarding matter not pleaded). The medical expenses were not in evidence and plaintiff's attorney did not argue these matters to the jury. We decide the point against defendant.

Defendant in its next two points of error claims that the verdict was so excessive as to show jury bias and prejudice, and that it was excessive due to a misunderstanding by the jury.

The courts in Missouri distinguish between a claim that the verdict is merely excessive in amount and a claim that the verdict is so excessive as to indicate jury prejudice. *Skadal v. Brown*, 351 S.W.2d 684, 689 (Mo.1961). A claim of mere excessiveness necessarily rests upon the jury's honest mistake in weighing the evidence and subsequently calculating the award. *Id.* It is essentially a claim that the verdict is against the weight of the evidence. *Greco v. Hendricks*, 327 S.W.2d 241, 245 (Mo. 1959). Remittitur of a portion of the award can correct such a mistake. *Skadal v. Brown*, 351 S.W.2d at 689–90.

■■■ A claim that the jury's verdict is so excessive as to indicate bias or prejudice is an allegation of jury misconduct. This claim of error, if well taken, can be cured only by a new trial. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945 (Mo. App.1978). Because the trial court can observe the effect of the trial proceedings upon the jury, it may infer the jury's bias or prejudice from the size of the verdict alone, even though in so doing the court must weigh the evidence. *Reynolds v. Arnold*, 443 S.W.2d 793, 801 (Mo.1969). Appellate courts, on the other hand, may not weigh the evidence nor infer bias or prejudice from the size of the jury's award alone. *Id.*

■■■ To successfully claim that the award is so excessive as to show jury prejudice, defendant must present evidence of some error or occurrence at trial sufficient to incite prejudice. *Id.* Defendant must also demonstrate that the evidence, when viewed in the light most favorable to the verdict, does not warrant such a verdict. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d at 945; *see Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, 117 (Mo.1973).

■■■ Defendant asserts two errors as sufficient to incite jury prejudice: first, the injection during voir dire of the fact of insurance, and second, the trial court's refusal to permit defense counsel to inform the jurors they should not consider medical bills in reaching their verdict. We have already ruled against defendant on these claims of error. Defendant has suggested no other error which could have affected the jury's deliberation process, and we have discovered none in our review of the record. Furthermore, in light of the evidence of Sheila's injuries, which we have described in detail, we cannot agree with defendant's claim that the verdict is "glaringly unwarranted." We rule against defendant on this point as well.

As previously noted, defendant also claims mere excessiveness of the verdict, that is, the jury awarded plaintiff such a large sum as a result of an honest mistake. Plaintiff argues that defendant has not preserved this claim of error for our review because defendant did not first present its claim to the trial court in a motion for new trial. *See Skadal v. Brown*, 351 S.W.2d at 690. Defendant stated in its motion for new trial that "[t]he verdict and judgment in this case is so grossly excessive that it shows a feeling of bias, passion, sympathy, prejudice and misunderstanding on the part of the jury against the defendant."

Defendant argues that the term "misunderstanding" in this paragraph of his motion was sufficient to bring to the trial court's attention a claim that the jury made a mistake calling for remittitur. Apparently the trial judge did not interpret defendant's motion as claiming mere excessiveness of the verdict. The memorandum overruling defendant's motion for new trial stated that although the court believed the verdict

was grossly excessive, it did not believe it was the product of the jury's prejudice or bias and would not therefore order a new trial. The court further stated it did not believe it was in a position to order remittitur because defendant's motion for new trial did not claim the verdict was against the weight of the evidence and defendant did not ask the court to grant a remittitur.

We, too, question whether defendant's motion for new trial alleges mere excessiveness of the verdict. Assuming, arguendo, that it does, we may not disturb the award fixed by the jury in its broad discretion, *Brown v. Moore*, 248 S.W.2d 553, 559 (Mo.1952), unless it clearly exceeds the maximum sustained by the evidence and shocks the conscience of this court. *Allen v. Bi-State Development Agency*, 452 S.W.2d 288, 293 (Mo.App.1970). After carefully reviewing the evidence, we do not find the verdict excessive.

Defendant emphasizes that the award is extravagant when compared with jury verdicts for similar injuries.[4] Comparable awards are, however, only one factor to be considered when reviewing an allegedly excessive verdict. Other factors include plaintiff's young age, the type of injury she has suffered, the permanency of her scars, and the rapidly declining purchasing power of the dollar. Furthermore, we defer to the jury's superior opportunity to assess plaintiff's injuries. *Woodford v. Illinois Central Gulf R.R. Co.*, 518 S.W.2d 712, 718 (Mo.App. 1974).

This opinion has already detailed plaintiff's injuries; we see no need for repetition here. It is sufficient to say that plaintiff is a young girl, just entering adolescence. The severe pain she has suffered in the past will recur in the future as she undergoes further treatment. Her mental anguish has been as debilitating as her physical wounds and will increase as she enters young adulthood. She faces a greatly increased risk of psychological problems and will need psychiatric counseling. Her scars, especially those on her neck and jaw, hands,

and deformed ear, are an obvious social handicap and subject her to ridicule from her classmates and others. Defense counsel conceded in closing argument that plaintiff's scars are "bad" and permanent. Because her scars are permanent, they will continue to be a social and employment handicap for the rest of her life.

The facts of every case differ. Therefore, consideration of so-called comparable verdicts is not always helpful in judging a particular verdict's excessiveness. The ultimate consideration is whether the award fairly compensates the plaintiff for her injuries. *Pulem v. George*, 433 S.W.2d 83, 86 (Mo.App.1968). While we believe the award in the instant case is substantial, Sheila's burn injuries are likewise severe and substantial, resulting in permanent disfigurement. We find no manifest injustice in the award. *See Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 946 (Mo. App.1978).

The judgment is, in all respects, affirmed.

All Judges concur.

4. *But see Tennis v. General Motors Corp.*, 625 S.W.2d 218, 230-31 (Mo.App.1981) (discusses recent jury awards that withstood attack for

excessiveness, including a $600,000 verdict from a Missouri court and out-of-state awards for $1,102,000 and $1,747,000).